# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| JIMMY DEAN HARRIS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. CIV-08-375-F |
| | ) | |
| TERRY ROYAL[1], Warden, | ) | |
| Oklahoma State Penitentiary, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION

Petitioner, a state prisoner currently facing execution of a sentence of death, appears with counsel and petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his convictions in the District Court of Oklahoma County, Case No. CF-1999-5071, of one count of first-degree murder, one count of shooting with intent to kill, and one count of assault and battery with a dangerous weapon. Respondent has responded to Petitioner's *Petition for a Writ of Habeas Corpus* (hereinafter "Petition"),[2] and Petitioner has replied. The State court record has been supplied.[3]

---

[1] During previous proceedings, Anita Trammell was the warden of the Oklahoma State Penitentiary. However, Terry Royal has since assumed that office. According to Fed. R. Civ. P. 25(d)(1), Mr. Royal is automatically substituted as a party.

[2] References to the parties' pleadings shall be as follows: Petitioner's *Petition for a Writ of Habeas Corpus* shall be cited as (Pet. at __.); Respondent's *Response in Opposition to Petition for Writ of Habeas Corpus* shall be cited as (Resp. at __.); and, Petitioner's *Reply To Respondent's Response to Petition for Writ of Habeas Corpus* shall be cited as (Reply at __.).

[3] The trial court's original record shall be cited as (O.R. at __.). The trial transcript shall be cited as (Tr., Vol. ___, p. __.).

## PROCEDURAL HISTORY

Petitioner was convicted by a jury in the District Court of Oklahoma County of one count of first-degree murder, one count of shooting with intent to kill, and one count of assault and battery with a dangerous weapon. For the crime of first-degree murder, the jury recommended the imposition of a sentence of death, finding the existence of the aggravating circumstance that Petitioner knowingly created a great risk of death to more than one person. He was also sentenced to life in prison for shooting with intent to kill and ten years in prison for assault and battery with a dangerous weapon.

Petitioner appealed his convictions and sentences to the Oklahoma Court of Criminal Appeals (hereinafter "OCCA"). The OCCA affirmed Petitioner's convictions and the non-capital sentences, but reversed the death sentence and remanded for a new sentencing trial for the first-degree murder conviction. Harris v. State, 84 P.3d 731 (Okla. Crim. App. 2004). At the resentencing trial the jury found the existence of two aggravating circumstances: (1) Petitioner knowingly created a great risk of death to more than one person; and (2) the existence of a probability Petitioner would commit criminal acts of violence that would constitute a continuing threat to society. The trial court sentenced Petitioner to death on the jury's recommendation. Petitioner's direct appeal from the resentencing trial was denied by the OCCA. Harris v. State, 164 P.3d 1103 (Okla. Crim. App. 2007). Certiorari was denied on March 24, 2008. Harris v. Oklahoma, 552 U.S. 1286 (2008). Petitioner filed an Application for Post-Conviction Relief which was denied by the OCCA in a published opinion. Harris v. State, 167 P.3d 438 (Okla. Crim. App. 2007).

# FACTUAL BACKGROUND

Under 28 U.S.C. § 2254(e), when a federal district court addresses "an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). For the purposes of consideration of the present Petition, the Court provides and relies upon the following synopsis from the OCCA's opinion summarizing the evidence presented at Petitioner's trial. Following review of the record, trial transcripts, and the admitted exhibits, the Court finds this summary by the OCCA to be adequate and accurate. The Court therefore adopts the following summary of the facts as its own:

> Harris, who was a skilled transmission mechanic, and his wife, Pam, worked in front office positions in transmission shops. Throughout their relationship the two often worked together. Despite being business partners as well as husband and wife, they had a stormy relationship. This worsened significantly when Pam was hired, but Harris was not, to work in Merle Taylor's AAMCO transmission shop in Oklahoma City. Harris commuted to work in Texas for several months, during which time the marriage suffered. After Harris had a work-related accident, he returned to Oklahoma. By the summer of 1999, Pam told him the marriage was over. While Harris agreed to a divorce, he was angry and upset, and continued to hope Pam would return to him. In mid-August of 1999, Harris called Pam, threatening to kill her, her parents, their daughter, her co-workers, and Merle Taylor. Pam got a protective order against Harris and filed for divorce. The divorce was granted on August 25, 1999, and Harris was ordered to leave the home without removing any property. Harris and Pam had previously taped an agreement dividing the house property. On the evening of the 25th, Harris moved out of the home, taking furniture and many of Pam's personal possessions. He also vandalized the house. Pam discovered the damage the next day, found out where Harris had stored her furniture and his tools, and had a lock put on that shed. In the succeeding days Harris called Pam often demanding that she remove the lock. Each time, she explained she could neither talk to him nor remove the lock, and told him to call her attorney. He refused,

3

explicitly stating he would talk to her. He continued to threaten her and others. On August 31, 1999, he threatened to kill Pam and was seen driving by the AAMCO shop.

On the morning of September 1, 1999, Harris called the AAMCO shop several times, demanding that she remove the lock on the storage shed and threatening Pam and Merle Taylor. At approximately 9:00 a.m. Harris arrived at the shop and asked for Pam, who was standing with Merle Taylor and his daughter-in-law Jessica. He shot Taylor twice at close range, and shot at Jessica. Harris shot Pam, chased her when she ran, and pistol-whipped her when he ran out of bullets and could not quickly reload his gun. When Pam escaped, Harris fled, discarded the gun and his van, and hid in a friend's garage. Harris claimed he was angry and upset, and could not make good decisions because he was of low intelligence, was under the influence of alcohol and drugs, and was mentally ill (although not legally insane).

To support the aggravating circumstances, the State presented the evidence of the circumstances of the crimes. There was also evidence that, during the ongoing difficulties in mid-August, Pam had called police and Harris had resisted arrest. The State presented evidence that Harris assaulted a jailer while awaiting trial, and had physically, verbally and emotionally abused Pam throughout their relationship. The State also presented victim impact evidence. In mitigation, Harris presented evidence from his family and former co-workers, as well as expert evidence, regarding his traumatic and abusive childhood, history of substance abuse, low intelligence, emotional instability, and possible mental illness.

Harris, 164 P.3d at 1106-07.

## PETITIONER'S CLAIMS FOR RELIEF

## STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 (hereinafter "AEDPA"), in order to obtain federal habeas relief once a State court has

adjudicated a particular claim on the merits, Petitioner must demonstrate that the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1-2).

The Supreme Court has defined "contrary to" as a State court decision that is "substantially different from the relevant precedent of this Court." Williams v. Taylor, 529 U.S. 362, 405 (2000) (O'Connor, J., concurring and delivering the opinion of the Court). A decision can be "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [Supreme Court] precedent." Id. at 405-06. The "unreasonable application" prong comes into play when "the state court identifies the correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id. at 407. In ascertaining clearly established federal law, this Court must look to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decisions." Yarborough v. Alvarado, 541 U.S. 652, 660-61 (2004) (quoting Williams, 529 at 412.

The "AEDPA's purpose [is] to further the principles of comity, finality, and federalism. There is no doubt Congress intended AEDPA to advance these

doctrines." <u>Williams v. Taylor</u>, 529 U.S. 420, 436 (2000). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold." <u>Schriro v. Landrigan</u>, 550 U.S. 465, 473 (2007). The deference embodied in Section 2254(d) "reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." <u>Harrington v. Richter</u>, 562 U.S. 86, 102-03 (2011)(citation omitted).

GROUNDS FOR RELIEF

<u>Ground 1</u>:    <u>Mental Health Rebuttal Evidence</u>.

During the first stage of trial, and after Petitioner had testified, the defense presented expert psychological and psychiatric testimony regarding Petitioner's intelligence and state of mind to support his diminished capacity defense of mental illness. Subsequent to the defense's notice that Petitioner intended to present such a defense, the State obtained permission to have Dr. John Call, a psychologist, interview Petitioner to determine if he was malingering. Dr. Call testified that Petitioner appeared to be feigning or exaggerating cognitive, memory, and emotional disorders. He also testified that Petitioner exhibited many traits of a psychopath.

Petitioner claims that the testimony of Dr. Call deprived him of a fundamentally fair trial as his testimony was a surprise and that the defense was not presented with a report prior to the testimony, that a prior determination was not made regarding scientific reliability and acceptability of the substance of Dr. Call's testimony, that "psycopath" is not a mental illness or disease, and as such, was only proper for indications of future behavior and improper evidence in the first stage of trial, that the testimony should have been excluded as being more prejudicial than probative, that evidence of bad character is barred under State law and admission of

such was a violation of Petitioner's liberty interest, and that the OCCA's determination was an unreasonable determination of the facts in light of the evidence presented. In short, Petitioner's claim is that the OCCA's determination that Dr. Call's testimony was properly admitted is unreasonable.

After noting that the State presented Dr. Call as a rebuttal witness subsequent to Petitioner's testimony and the defense presentation of expert testimony of mental illness, the OCCA rejected Petitioner's claim of surprise and failure to excluded Dr. Call's testimony as a discovery sanction:

> First, we reject Appellant's contention that Dr. Call's testimony should have been excluded as a discovery sanction. Generally, the State need not give advance notice of rebuttal evidence, because it cannot know before trial what evidence will be relevant in rebuttal. Goforth v. State, 1996 OK CR 30, ¶ 3, 921 P.2d 1291, 1292. Dr. Call only interviewed Appellant after the defense gave notice that it intended to present a defense based on Appellant's mental health. Defense counsel was present when Dr. Call interviewed Appellant. Appellant had access to his own mental-health experts to review Dr. Call's notes and testimony. After Dr. Call testified on direct examination, the trial court granted Appellant's request for additional time to prepare for cross-examination. Appellant was not unfairly surprised by Dr. Call's testimony.

Harris, 84 P.3d at 745.

Dr. Call was called by the State in rebuttal to a defense based on a claim of diminished mental health. Defense counsel was present during Dr. Call's examination and testing of Petitioner and during the trial court's in camera hearing on Dr. Call's techniques and the information utilized in reaching his conclusions. Counsel was given the opportunity during the in camera hearing to question Dr. Call and was permitted to re-call him for cross-examination after the defense expert reviewed his work. Further, as noted by the OCCA, after Dr. Call's testimony the trial court granted defense counsel's request for additional time to prepare for cross-

examination.   Considering the above, Petitioner has not demonstrated the OCCA's determination to be unreasonable.

Petitioner further claims it was error for the trial court to not hold a prior hearing on the scientific reliability and acceptability of the substance of Dr. Call's methods and testimony consistent with Daubert v. Merrel Dow Pharmaceuticals, 509 U.S. 579 (1993).   Although lengthy, the OCCA's determination denying the claim is set forth here in its entirety to set forth the facts and procedure regarding Dr. Call's testimony and to demonstrate the state court's thorough and well considered review:

> We next consider whether the trial court erred by not holding a hearing on the reliability of Dr. Call's methods consistent with Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).   In Daubert, the Supreme Court recognized a trial court's important responsibility, as well as its broad discretion, in assessing the admissibility of novel scientific evidence.   The Court identified several factors which may aid trial judges in determining whether expert evidence is scientifically valid, and thus reliable enough, to be admissible under the permissive guidelines of the Federal Rules of Evidence.   The Court stressed that its list of relevant factors was not exhaustive, and that whether any of the factors mentioned were applicable could only be determined on a case-by-case basis.   In essence, the Court held that while not all evidence deemed "scientific" had to earn general acceptance in the scientific community before being admissible, all such evidence should bear some indicia of traditional scientific method.   The focus should be "solely on principles and methodology, not on the conclusions that they generate." Daubert, 509 U.S. at 595, 113 S.Ct. at 2797.   The Court subsequently extended Daubert's principles to non-scientific but otherwise technical and specialized expert testimony in Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150–51, 119 S.Ct. 1167, 1175, 143 L.Ed.2d 238 (1999).   We adopted the Daubert analysis in Taylor v. State, 1995 OK CR 10, ¶ 15, 889 P.2d 319, 328–29, and have likewise extended it (per Kumho ) to other types of expert testimony. Harris v. State, 2000 OK CR 20, ¶ 9, 13 P.3d 489, 493.

Before Dr. Call testified, the trial court held an in camera hearing on the techniques he used and the reasonableness of his reliance on certain information to reach his conclusions. The hearing was consistent with our holding in Lewis v. State, 1998 OK CR 24, ¶ 21, 970 P.2d 1158, 1167, that the trial court should determine the admissibility of expert testimony before it is presented to the jury. At that hearing, Dr. Call stated that the Hare Psychopathy Checklist was "the most widely respected technique to assess psychopathy." He testified as to his experience in administering the technique, and explained that the Checklist necessarily required him to obtain information from immediate family which, in this case, included the surviving victim, Mrs. Harris. Dr. Call testified that he did not tell Mrs. Harris the purpose of his inquiry, and that he took her potential for bias into account. He also stated that not all of Mrs. Harris's observations about Appellant were negative, and that many of her observations were corroborated by others, including Appellant himself. The defense cross-examined Dr. Call about his methods, but did not present any evidence of its own. The trial court found Dr. Call's methods reliable and his testimony admissible. Defense counsel did not claim this hearing was insufficient under Daubert until after Dr. Call had testified on direct examination. Based on the information developed at the original "Lewis" hearing, the trial court concluded that no further Daubert inquiry was necessary.

Appellant complains that the Lewis hearing was not tantamount to a Daubert hearing, because it did not address either "relevancy or reliability of psychopathy opinion testimony in the guilt/innocence phase of a criminal trial," and claims that the Hare technique is "clearly irrelevant and unreliable in this context" (emphasis added). We view these concerns as a matter of general relevance, not affecting the soundness of Dr. Call's methods themselves. There was no evidence that Dr. Call modified the Hare technique in any way, or that he used it to assess anything but Appellant's psychopathic tendencies. Appellant's complaint is not that the Hare Psychopathy Checklist is unreliable per se, but that the Checklist did not assist the trier of fact, see 12 O.S.2001, § 2702, because it was not a reliable indicator of anything relevant to Appellant's guilt. We conclude that it was.

Appellant correctly notes that the Hare Psychopathy Checklist is routinely used to determine whether a person poses a threat to others generally; thus, the Checklist is often employed in capital-sentencing proceedings (e.g. to show the defendant is a continuing threat to society) and civil commitment proceedings (e.g. to justify involuntarily commitment of a sexual predator). However, merely because psychopathy evidence is relevant for these purposes does not render it irrelevant for any other purpose. Any ability of the Checklist to predict future behavior must necessarily be based on its ability to indicate tendencies presently existing in the subject's personality – which in turn is based, in part, on an examination of the subject's past behavior.

Appellant's own experts – also relying in part on Appellant's past behavior – testified to support the defense theory that Appellant's mental functioning was impaired, and ultimately, that Appellant was (at least at the time of the crime) unable to form a specific intent to kill. In turn, the State was entitled to offer alternative explanations of Appellant's behavior. Appellant points out that psychopathy is not a recognized mental disorder. This, of course, is exactly why the State introduced the evidence in question: to show that Appellant's behavior was not the result of a diminished mental capacity, but rather the product of a generally violent personality for which he should be held accountable. We have repeatedly held that the State may present rebuttal evidence on mental-health issues raised by the defense. See Lockett v. State, 2002 OK CR 30, ¶ ¶ 22–25, 53 P.3d 418, 425; Van White v. State, 1999 OK CR 10, ¶ 52, 990 P.2d 253, 268–69; Maghe v. State, 1980 OK CR 100, ¶ 7, 620 P.2d 433, 435; see also 12 O.S.2001, § 2404(A)(1) (where accused presents evidence of a pertinent character trait, the prosecution may present evidence to rebut the same). Dr. Call's opinions, and prosecutor commentary on this evidence as bearing on Appellant's ability to form an intent to kill, were not improper.

Finally, we note that the jury was well aware of the limitations on Dr. Call's testimony. Dr. Call made it clear that while Appellant exhibited many behaviors associated with psychopathy, he also exhibited many behaviors inconsistent with psychopathy. Dr. Call admitted he could not conclusively state that Appellant was a psychopath, and conceded that even a psychopath may suffer from some other recognized mental illness. The trial court's limiting instruction, which Appellant did not

object to, was patterned after the one used by the trial court in <u>Lewis v. State</u>, and we find it appropriate here as well. Proposition 2 is denied.

<u>Harris</u>, 84 P.3d at 744-47 (footnotes omitted).

Rather than apply <u>Daubert</u> to the facts in the record, this Court must determine whether the OCCA's decision was an unreasonable determination that Petitioner received a fair trial. In <u>Wilson v. Simons</u>, 536 F.3d 1064 (10th Cir. 2008), the Tenth Circuit considered a claim that admission of certain DNA results without a <u>Daubert</u> hearing violated the petitioner's Eighth and Fourteenth Amendment rights. Denying the claim, the Tenth Circuit held:

> "As a general matter, federal habeas corpus relief does not lie to review state law questions about the admissibility of evidence...." <u>Moore v. Marr</u>, 254 F.3d 1235, 1246 (10th Cir.2001) (internal citations omitted). Absent a showing that the admission of the evidence violated a specific constitutional guarantee, a federal court on habeas review will not disturb the state court's evidentiary ruling unless it was "so grossly prejudicial that it fatally infected the trial and denied the fundamental fairness that is the essence of due process." <u>Fox v. Ward</u>, 200 F.3d 1286, 1296 (10th Cir.2000) (quoting <u>Williamson v. Ward</u>, 110 F.3d 1508, 1522 (10th Cir.1997)); <u>Milone v. Camp</u>, 22 F.3d 693, 702 (7th Cir.1994). Because <u>Daubert</u> does not set any specific constitutional floor on the admissibility of scientific evidence, the only relevant question is whether the PCR test rendered the trial fundamentally unfair. <u>Milone</u>, 22 F.3d at 702; see also <u>Norris v. Schotten</u>, 146 F.3d 314, 335 (6th Cir.1998).

<u>Id.</u> at 1101-02.

As stated above, Dr. Call testified in camera before his rebuttal testimony and was subjected to defense counsel's questioning. The trial court granted defense counsel's request for additional time to review Dr. Call's testimony and was permitted to re-call Dr. Call for cross-examination after the defense expert reviewed his work. The Hare checklist utilized by Dr. Call was not novel. It was utilized to not only predict future dangerousness but also as a diagnostic tool for treatment and

management.   Dr. Call's opinion was based on the results of this recognized diagnostic tool and offered to rebut the claim that Petitioner was not capable of intending to kill Mr. Taylor.   In fact, his opinion was corroborated by Petitioner's own second stage expert who agreed Petitioner had many of the traits of an individual with psychopathy or antisocial personality disorder. (Tr., Vol. XVIII, pp. 181-82, 192-93).

Petitioner has not demonstrated the determination of the OCCA's was contrary to, or an unreasonable application of, clearly established Supreme Court law.   Nor has Petitioner demonstrated that the admission of Dr. Call's testimony rendered the trial fundamentally unfair.   Petitioner's first ground for relief is denied.

Ground 2:   Mental Capacity Jury Instruction.

Petitioner next claims that the trial court erred when it instructed the jury, over defense objection, that mental retardation was a defense to the charged offenses only if it rendered him incapable of knowing the wrongfulness of the offenses because of his mental retardation.   Petitioner claims this instruction denied him the right to present a defense to the intent element of malice aforethought murder in violation of his Sixth and Fourteenth Amendment rights.[4]

On appeal, the OCCA determined no prejudice existed and no violation of Petitioner's rights:

> In Proposition 5, Appellant contends that the trial court's instructions to the jury relating to his defense were confusing, improper, and denied him a fair trial.   Appellant offered evidence that "low intelligence, mental illness, and drug and alcohol induced intoxication" combined to give him "limited control" over his actions at the time of the crimes.   The goal of Appellant's defense was to show that at the time of the shootings, he could not have formed a specific intent to kill.

---

[4] Petitioner adds the absence of an instruction on second degree depraved mind murder compounded the denial of his rights.   See Ground 3, infra.

He requested and received a jury instruction on a lesser form of homicide, First–Degree Manslaughter, arguably compatible with his defense. However, because Appellant had attempted to show that he was at least "borderline" mentally retarded, the trial court also instructed the jury, over defense objection but consistent with Oklahoma law, that mental retardation was a complete defense to culpability if it rendered the accused incapable of knowing the wrongfulness of his acts. See 21 O.S.2001, § 152(3).

Appellant claims the trial court's instruction on mental retardation as a complete exculpatory defense was not supported by the evidence. We agree. The accused is entitled to instructions on any defense theory, whether it be mitigating or exculpatory, if the law and evidence reasonably support that theory. Cipriano v. State, 2001 OK CR 25, ¶ 30, 32 P.3d 869, 876. Because, as Appellant concedes, the evidence failed to suggest he was mentally retarded to the extent he could not appreciate the wrongfulness of his actions, the trial court's instruction on mental retardation as an exculpatory defense was unwarranted.

We fail to see how this instruction prejudiced Appellant. The instruction actually saddled the State with the additional preliminary burden of proving that Appellant was not mentally retarded before he could be convicted of any crime. Even though the outcome might have been unlikely, the instruction gave the jurors the option of finding Appellant not guilty of any crime, if they believed his intellectual capacity was so diminished that he could not distinguish right from wrong. Finally, the instruction in no way discouraged the jury from fully considering Appellant's intellectual abilities, along with his alleged mental illness and substance abuse, on the issue of whether he lacked the ability to form a specific intent to kill. Because the instruction could only have worked to Appellant's benefit, we find no violation of his substantial rights. McGregor v. State, 1994 OK CR 71, ¶ 23, 885 P.2d 1366, 1380; Allen v. State, 1994 OK CR 13, ¶ 33, 871 P.2d 79, 93. Proposition 5 is denied.

Harris, 84 P.3d at 749-50.

A petitioner seeking collaterally to attack a state court conviction based on an erroneous set of jury instructions "bears a heavy burden of proof." <u>Shafer v. Stratton</u>, 906 F.2d 506, 508 (10th Cir.1990). "Habeas proceedings may not be used to set aside a state conviction on the basis of erroneous jury instructions unless the errors had the effect of rendering the trial so fundamentally unfair as to cause a denial of a fair trial in the constitutional sense," <u>Shafer</u>, 906 F.2d at 508 (quotation omitted), or "so infected the entire trial that the resulting conviction violates due process," <u>Estelle v. McGuire</u>, 502 U.S. 62, 72 (1991) (<u>quoting</u> <u>Cupp v. Naughten</u>, 414 U.S. 141, 147 (1973)).

Petitioner has not demonstrated the trial court's instruction had a substantial and injurious effect or influence on the jury's verdict, <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 631 (1993), or that the OCCA's determination was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court. Accordingly, Petitioner's ground for relief is denied in its entirety.

<u>Ground 3:</u>    <u>Failure to Instruct on Lesser Offense.</u>

In <u>Beck v. Alabama</u>, 447 U.S. 625 (1980), the Supreme Court held that the Due Process Clause of the Fourteenth Amendment sometimes requires a state charging a defendant with a capital offense to permit the jury to consider alternative, lesser included offenses that do not carry with them the prospect of a death sentence. <u>Id.</u> at 627; <u>see also Schad v. Arizona</u>, 501 U.S. 624, 647 (1991). At the first stage of trial the State charged Petitioner with first-degree malice aforethought murder. The trial court denied defense counsel's request to instruct the jury on second-degree depraved mind murder, but did instruct on a lesser offense of first-degree manslaughter. Petitioner claims here that the denial of his requested instruction on the lesser offense of second-degree depraved mind murder violated his Sixth, Eighth, and Fourteenth Amendment rights.

In <u>Beck</u>, the Supreme Court held that "a sentence of death [may not] constitutionally be imposed after a jury verdict of guilt of a capital offense, when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, *and when the evidence would have supported such a verdict*." <u>Id.</u> at 627 (emphasis added). On appeal, the OCCA determined the evidence did not warrant an instruction on second degree murder:

> In Proposition 10, Appellant claims error in the trial court's rejection of his proposed instructions on the lesser offense of Second Degree (Depraved Mind) Murder, as well as his proposed instruction attempting to define "reasonable doubt." As to the first claim, the trial court was required to instruct on every degree of homicide reasonably supported by the evidence. <u>Shrum v. State</u>, 1999 OK CR 41, ¶ 10, 991 P.2d 1032, 1036. To warrant an instruction on Second Degree (Depraved Mind) Murder, the evidence must reasonably support the conclusion that the defendant committed an act so imminently dangerous to another person as to evince a depraved mind in disregard for human life. <u>Williams v. State</u>, 2001 OK CR 9, ¶ 23, 22 P.3d 702, 712.

> Appellant shot Taylor twice at close range, immediately after pushing him down to the ground. Appellant testified that he shot Taylor "accidentally," "without thinking or knowing" what he was doing. Instructions on depraved-mind murder are unwarranted when the defense claims the fatal gunshots were fired accidentally. <u>Crumley v. State</u>, 1991 OK CR 72, ¶ 13, 815 P.2d 676, 678–79. Furthermore, in determining the sufficiency of the evidence to support a lesser offense, we look to whether the evidence might allow a jury to acquit the defendant of the greater offense and convict him of the lesser. <u>Cipriano</u>, 2001 OK CR 25 at ¶ 14, 32 P.3d at 873. Given the substantial evidence that Appellant drove to the transmission shop to do violence (see discussion of Proposition 6), we do not believe any rational trier of fact could have found Appellant evinced a depraved mind but lacked an intent to kill. <u>Cf.</u> <u>Young v. State</u>, 2000 OK CR 17, ¶¶ 61–62, 12 P.3d 20, 39–40 (instructions on depraved-mind murder correctly refused where defendant entered restaurant with intent to rob its occupants with firearm, stood directly in front of victim, raised gun,

demanded money, and fatally shot victim in the back of the chest when victim tried to defend himself), cert. denied, 532 U.S. 1055, 121 S.Ct. 2200, 149 L.Ed.2d 1030 (2001); Boyd v. State, 1992 OK CR 40, ¶ 11, 839 P.2d 1363, 1367–68, cert. denied, 509 U.S. 908, 113 S.Ct. 3005, 125 L.Ed.2d 697 (1993) (instructions on depraved-mind murder correctly refused where defendant shot victim a second time in the chest at close range).

Harris, 84 P.3d at 750.

In Shad v. Arizona, 501 U.S. 624, 645-48 (1991), the Supreme Court held that Beck's requirement is satisfied so long as the jury is instructed on at least one lesser included offense that is supported by the evidence. Here, the trial court instructed on the lesser included offense of first-degree manslaughter.

The OCCA's determination that the evidence did not warrant an instruction on second degree murder was neither contrary to, nor an unreasonable application of, clearly established federal law. As detailed by the OCCA, Petitioner's testimony that he "accidently" and "without thinking or knowing" what he was doing does not warrant an instruction on second degree depraved mind murder under Oklahoma law. The OCCA further determined that substantial evidence existed that Petitioner intentionally went to the transmission shop to do violence such that no rational trier of fact could have found Petitioner evinced a depraved mind but lacked the intent to kill – i.e., that the evidence did not support the lesser instruction of second degree depraved mind murder.

As Beck's requirements were met, and the OCCA's determination was not contrary to, or a unreasonable application of, federal law, Petitioner has not demonstrated that failure to instruct on second degree depraved mind murder rendered his trial fundamentally unfair. See James v. Gibson, 211 F.3d 543, 555 (10th Cir. 2000). Accordingly, Petitioner's third ground for relief is denied.

Ground 4:    Impartial Jury Claim.

Petitioner claims the prosecution utilized four of its nine peremptory challenges to remove venire persons without sufficient race neutral reasons and that the trial court's acceptance of the reasons and dismissal of those prospective jurors was a violation of his Fifth, Sixth, and Fourteenth Amendment rights as provided in Batson v. Kentucky, 476 U.S. 79 (1986).

In Batson, the Supreme Court held that although a prosecutor ordinarily is entitled to exercise permitted peremptory challenges "'for any reason at all, as long as that reason is related to his view concerning the outcome' of the case to be tried, . . . the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." Id. at 89 (internal citations omitted).   Subsequently, the Supreme Court articulated Batson's three-step process for evaluating claims that a prosecutor used peremptory challenges in violation of the Equal Protection Clause:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race. 476 U.S., at 96-97, 106 S.Ct. 1712.   Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question. Id., at 97-98, 106 S.Ct. 1712.   Third, in light of the parties' submissions, the trial court must determine   whether the defendant has shown purposeful discrimination. Id., at 98, 106 S.Ct. 1712.

Miller-El v. Cockrell, 537 U.S. 322, 328-29 (2003).

On appeal, Petitioner raised his claim as to four minority veniremen excused by the prosecution's use of its peremptory challenges.   Petitioner asserts his claim here, however, only as to one venire person, stating "[d]ue to the limitations of the AEDPA only the peremptory strike as to juror Carol Gray is being pursued in this Petition." (Pet. at 39)   The OCCA identified Batson as controlling authority and set

forth its three part inquiry, analyzed all four of Petitioner's claims, and denied relief. Harris, 84 P.3d at 743. As to the claim raised here, the OCCA stated:

> The prosecutor moved to strike Ms. Gray because her answers to questions were unclear, and because she made several comments suggesting she would be sympathetic to Appellant's defense. Appellant's claim that the prosecutor deliberately asked Ms. Gray confusing questions is not supported by the record. Ms. Gray stated that in her opinion, people who acted under the influence of alcohol were less responsible for their actions. The prosecutor's concern about Ms. Gray's ability to assimilate the facts and follow the law was a plausible, race-neutral reason for removing her. In conclusion, we find no evidence that the prosecutor's stated reasons for striking these panelists were so fantastic or incredible as to warrant relief. Proposition 8 is denied.[5]

Harris, 84 P.3d at 743.

"The disposition of a Batson claim is a question of fact...." Saiz v. Ortiz, 392 F.3d 1166, 1175 (10th Cir. 2004). As long as the state court applied Batson, Petitioner is entitled to relief only if the state court's rejection of his claim "was 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.' " Black v. Workman, 682 F.3d 880, 896 (10th Cir. 2012)(quoting 28 U.S.C. § 2254(d)(2)).

Petitioner challenges the removal of Ms. Gray claiming that the prosecutor utilized a peremptory challenge to excuse her because she was a black woman. The prosecutor's expressed reasons for excusing Ms. Gray included Ms. Gray's inability

---

[5] As an initial matter, we note that Appellant is Caucasian, his victims were Caucasian, and that there were no identifiable race-related issues in the trial itself; that one of the panelists complained of here (Ms. King) was not, according to the trial court, of a minority race; that several members of the final jury panel were of a minority race; and that the prosecutor did not use every peremptory challenge to remove a minority panelist. (Footnote 8 original)

to understand many of the questions presented to her and her multiple non-responsive answers. The prosecutor's reasons for exercising a peremptory challenge, and the trial court's acceptance of those stated reasons, are supported by review of the record. Many of Ms. Gray's responses to pointed questions were often confusing. When asked what things in life caused her to think about the death penalty, Ms. Gray's response reflected thought about guilt and innocence as well as statements regarding the media's inaccurate reporting of facts. She did not respond concerning the death penalty. (Tr., Vol. 3, pp. 150-51) When asked whether in her opinion Timothy McVeigh deserved the death penalty, Ms. Gray responded: "I only know by people that were there that told me. They would tell me something that were actually there. They couldn't have seen everything, just certain. They, you know, were here at the same time. They just tell me about their situation." (Id.) Ms. Gray responded to almost every question presented to her about the whether she could impose the death penalty as a sentence by referring to evidence and the fact that she did not know all the details prevented her from knowing if any sentence of death had ever been appropriate or justified. (Tr., Vol. 3, pp. 147-51) Ms. Gray further stated that in her opinion people under the influence of alcohol were less responsible for their actions because they were not aware of what they were doing. (Tr., Vol. 3, pp. 161-62)

The prosecutor provided several race-neutral reasons to strike Ms. Gray from serving on the jury. The OCCA determined from its review that the prosecutor's concern about Ms. Gray's ability to assimilate the facts and follow the law was plausible, and that there was no evidence to support granting Petitioner's claim for relief. Petitioner has not satisfied his burden of demonstrating that the OCCA's determination was either contrary to, or an unreasonable application of, clearly established federal law, nor has he demonstrated that the OCCA's determination was

an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.   Accordingly, Petitioner's claim for relief is denied.

Ground 5:    Ineffective Assistance of Appellate Counsel in 2001 Direct Appeal.

Petitioner claims he was denied effective assistance of appellate counsel in his 2001 direct appeal when propositions of error were not presented regarding prosecutorial misconduct in the first stage of trial, failure to claim ineffective assistance of trial counsel for not obtaining micro-cassette tapes, failure by appellate counsel to interview jurors and raise the issue of ineffective assistance of trial counsel regarding Petitioner being seen by the jury wearing restraints, and failure to raise the claim on appeal that the trial court did not instruct the jury the prosecution must prove beyond a reasonable doubt the absence of heat of passion.

To prevail on a claim of ineffective assistance of counsel under the Sixth Amendment, Petitioner must first show that his counsel "committed serious errors in light of 'prevailing professional norms'" in that the representation fell below an objective standard of reasonableness.   See Strickland v. Washington, 466 U.S. 668, 688 (1984).   In so doing, Petitioner must overcome the "strong presumption" that his counsel's conduct fell within the "wide range of reasonable professional assistance" that "'might be considered sound trial strategy,'" Strickland, 466 U.S. at 689, quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955).   He must, in other words, overcome the presumption that his counsel's conduct was constitutionally effective.   United States v. Haddock, 12 F.3d 950, 955 (10th Cir. 1993).   A claim of ineffective assistance "must be reviewed from the perspective of counsel at the time," Porter v. Singletary, 14 F.3d 554, 558 (11th Cir.), cert. denied, 513 U.S. 1009 (1994), and, therefore, may not be predicated on "'the distorting effects of hindsight.'"   Parks v. Brown, 840 F.2d 1496, 1510 (10th Cir. 1987), quoting Strickland, 466 U.S. at 689.

If constitutionally deficient performance is shown, Petitioner must then demonstrate that "there is a 'reasonable probability' the outcome would have been different had those errors not occurred." Haddock, 12 F.3d at 955; citing Strickland, 466 U.S. at 688, 694; Lockhart v. Fretwell, 506 U.S. 364, 369-70 (1993). In the specific context of a challenge to a death sentence, the prejudice component of Strickland focuses on whether "the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695; quoted in Stevens v. Zant, 968 F.2d 1076, 1081 (11th Cir. 1992), cert. denied, 507 U.S. 929 (1993). Petitioner carries the burden of establishing both that the alleged deficiencies unreasonably fell beneath prevailing norms of professional conduct and that such deficient performance prejudiced his defense. Strickland, 466 U.S. at 686; Yarrington v. Davies, 992 F.2d 1077, 1079 (10th Cir. 1993). In essence, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686. "Counsel's performance must be 'completely unreasonable' to be constitutionally ineffective, 'not merely wrong.'" Welch v. Workman, 639 F.3d 980, 1011 (10th Cir. June 7, 2010)(quoting Hoxsie v. Kerby, 108 F.3d 1239, 1246 (10th Cir. 1997)). "Surmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 559 U.S. 356, 371, 130 S.Ct. 1473, 1485 (2010).

Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both "highly deferential," [Strickland] at 689, 104 S.Ct. 2052; Lindh v. Murphy, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, Knowles, 556 U.S., at 123, 129 S.Ct. at 1420. The Strickland standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at 123, 129 S.Ct. at

1420 .   Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d).   When § 2254(d) applies, the question is not whether counsel's actions were reasonable.   The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

Harrington v. Richter, 562 U.S. 86, 105 (2011).

Demonstrating deficient performance of appellate counsel can often be more difficult:

> In Jones v. Barnes, 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983), we held that appellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal. Notwithstanding Barnes, it is still possible to bring a Strickland claim based on counsel's failure to raise a particular claim, but it is difficult to demonstrate that counsel was incompetent. See, e.g., Gray v. Greer, 800 F.2d 644, 646 (C.A.7 1986) ("Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome").

Smith v. Robbins, 528 U.S. 259, 288 (2000).

In analyzing an appellate ineffectiveness claim based upon the failure to raise an issue on appeal, "we look to the merits of the omitted issue," Neill v. Gibson, 278 F.3d 1044, 1057 (10th Cir.2001).

> If the omitted issue is so plainly meritorious that it would have been unreasonable to winnow it out even from an otherwise strong appeal, its omission may directly establish deficient performance; if the omitted issue has merit but is not so compelling, the case for deficient performance is more complicated, requiring an assessment of the issue relative to the rest of the appeal, and deferential consideration must be given to any professional judgment involved in its omission; of course, if the issue is meritless, its omission will not constitute deficient performance. See, e.g., Smith [v. Robbins], 528 U.S. [259], 288, 120 S.Ct. 746; Banks v. Reynolds, 54 F.3d 1508, 1515-16 (10th Cir. 1995); Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994).

Cargle v. Mullin, 317 F.3d 1196, 1202-03 (10th Cir. 2003).

       1. Failure to present a prosecutorial misconduct claim.

Petitioner claims appellate counsel was ineffective for failing to raise a claim of prosecutorial misconduct. He claims the prosecutor improperly denigrated the defense, defense counsel, defense witnesses, and made improper comments during cross-examination. Petitioner raised this claim in his 2005 post-conviction proceeding. After the OCCA noted that appellate counsel is not required to raise every non-frivolous claim, the OCCA determined Petitioner's claim did not form the basis of a finding of ineffective assistance of appellate counsel:

> Harris first argues appellate counsel should have claimed that prosecutorial misconduct occurred in the first stage of Harris's trial. A thorough review of the record does not support Harris's claims. He first cites instances where, he claims, the prosecutor denigrated the defense, defense counsel and witnesses, and made improper comments to the jury. Many of the prosecutor's statements or questions were proper: Harris's objections to some improper questions were sustained; and Harris fails to show how he was prejudiced by comments which might have crossed the line. Harris also argues that the prosecutor attempted to incite societal alarm by referring to the missing murder weapon. Specific references to evidence relevant to this case, or Harris's own actions regarding potential evidence, do not constitute societal alarm. Harris suggests that the alleged misconduct in first stage closing argument amounts to structural error. Without engaging in an analysis of structural error, the record does not support his suggestion that this argument contained errors which prejudiced Harris; thus, the argument certainly could not have constituted structural error. Harris has not demonstrated prejudice from appellate counsel's failure to raise first stage prosecutorial misconduct, and this claim cannot form the basis for a finding of ineffective assistance of appellate counsel.

Harris, 167 P.3d at 442.

The deferential standard of review under 28 U.S.C. § 2254(d) is required since the OCCA adjudicated Petitioner's prosecutorial misconduct claim on the merits.

See Walker v. Gibson, 228 F.3d 1217, 1241 (10th Cir. 2000), abrogated on other grounds by Neill v. Gibson, 278 F.3d 1044, 1057 (10th Cir. 2001). Petitioner does not demonstrate that the asserted prosecutorial misconduct denied him a specific constitutional right. The appropriate standard for a prosecutorial misconduct habeas claim, therefore, is "'the narrow one of due process, and not the broad exercise of supervisory power.'" Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 642 (1974)). Accordingly, "it is not enough that the prosecutor's remarks were undesirable or even universally condemned." Darden, 477 U.S. at 181 (citation omitted). A prosecutor's improper remarks require reversal of a conviction or sentence only if the remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly, 416 U.S. at 643, 645 (1974). The fundamental fairness inquiry requires an examination of the entire proceedings and the strength of the evidence against the petitioner, both as to the guilt stage and the sentencing phase. Id. at 643.

As stated by the OCCA, a majority of the complained of questions by the prosecutor were proper and addressed discrepancies in the testimony of witnesses and the Petitioner. Further, as to any comments directed toward Petitioner's defense, experts testified Petitioner had borderline mental functioning that would have diminished his capacity to reason and solve problems. The jury was aware of this testimony, and any claimed "denigration" of Petitioner's defense by the prosecution would cause little to no prejudice compared to the information and opinions provided by both sides' experts and additional facts and testimony presented at trial. Most importantly, Petitioner has not demonstrated the complained of comments by the prosecutor so infected the trial with unfairness as to rise to a denial of due process.

Appellate counsel is not required to raise every non-frivolous claim, and the fact appellate counsel did raise a second stage prosecutorial claim is suggestive of a thorough review of the record and reasoned determination in support of a strategic decision to not include a first stage prosecutorial claim. Petitioner has failed to demonstrate the OCCA's determination was contrary to, or an unreasonable application of, clearly established Supreme Court law.

      2.   Trial counsel's failure to obtain micro-cassette tapes.

Petitioner next claims ineffective assistance of appellate counsel for failing to raise the claim of trial counsel ineffectiveness. Petitioner claims trial counsel was ineffective for failing to conduct pre-trial discovery to obtain micro-cassette tapes belonging to Petitioner. The tapes were seized out of Petitioner's van pursuant to a search warrant and reportedly contained recorded conversations between Petitioner and his wife regarding what property she agreed he could take from their house upon their separation. Petitioner argues the tapes were relevant to show he was acting in conformity with their agreement and that Ms. Harris's failure to live up to that agreement and the withholding of his tools was the provocation that led to Petitioner going to Ms. Harris's place of business on the day of the homicide. Petitioner claims trial counsel knew the tapes were material and was ineffective for failing to formally request the tapes and for failing to issue a subpoena duces tecum to Ms. Harris.

> Harris next argues that appellate counsel failed to claim trial counsel was ineffective. He fails to show that he was prejudiced by appellate counsel's omission. None of these separate claims of ineffective assistance of trial counsel, which were not raised on Harris's direct appeal, form a basis for a finding of ineffective assistance of appellate counsel.

> Harris first argues that counsel failed to find or produce microcassette tapes which he alleges were seized by the State in

Harris's van. Harris raises the issue of these tapes in his motion for discovery as well. He argues the tapes, allegedly a record of his conversations with his wife Pam concerning what he could take from their home, would show he was acting in accordance with her wishes when he moved certain things from the house. Harris suggests this would have explained why he was so angry when Pam locked up his tools after he moved. Even if this were true, it completely fails to account for the evidence showing Harris took other things which Pam testified were not part of that agreement, and that Harris also defaced the home as he left. In addition, this evidence goes to Harris's relationship with Pam and his reason for being at the AAMCO transmission shop. However, Harris killed a third party, with whom he had no quarrel. Harris fails to show how introduction of the microcassette tapes would have resulted in a different outcome.

Harris, 167 P.3d at 442.

Petitioner testified he had taped several conversations between himself and Ms. Harris about the division of their marital property. Two other witnesses, Petitioner's daughter and Petitioner's brother, testified they had listened to the tapes. Petitioner's brother testified Ms. Harris stated on the tapes that Petitioner could take everything in the house except a couple of large items of furniture and her family photographs.

Subsequent to the recording of these conversations, Ms. Harris obtained a court order giving her the house and all of its contents. The court also verbally ordered Petitioner not to remove anything from the house. Petitioner took items from the house and put them in a storage unit. Ms. Harris, thereafter, obtained a court order to lock the storage unit. The day before, and the day of, the murder Petitioner demanded Ms. Harris remove the lock. Petitioner blamed the shootings on her failure release the property in the storage unit he believed to belong to him.

Petitioner has not demonstrated how trial counsel was deficient for failing to obtain the tapes or how he was prejudiced by their absence. Extensive testimony

was received explaining the contents of the recorded conversations, as well as the subsequent legal proceedings regarding the marital property. Petitioner learned of the court-ordered lock on the storage unit five days before the murder. Although Petitioner testified he blamed the shootings on Ms. Harris's failure to give him his property from the storage unit, he has not demonstrated, especially in light of the court orders concerning the property, what additional information not presented at trial was contained on the tapes or how they would have supported legal provocation regarding the murder of a third person.

As the claim of ineffective assistance of trial counsel in insufficient to warrant relief, appellate counsel cannot be determined ineffective for failing to raise the claim on appeal. Petitioner has not demonstrated the OCCA's determination to be contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court.

### 3. Failure to interview jurors.

Petitioner claims appellate counsel was ineffective for failing to interview and investigate jurors from his first trial. He contends had counsel conducted interviews it would have been discovered that the jurors saw Petitioner in handcuffs, and that failure to do so was deficient performance. He asserts that one juror stated the jurors who came to court early would see Petitioner being escorted in handcuffs from the elevator to the courtroom, and that upon the pronouncement of the guilty verdict a deputy sheriff "popped out his handcuffs and they made such a loud noise that everyone on the jury and in the courtroom jumped." (Pet. at 64)

> Harris argues that appellate counsel should have claimed trial counsel was ineffective because jurors at his first trial saw Harris in restraints as he was escorted to and from the courtroom and after the guilty verdict was pronounced. While Harris likens this to cases in which a person is tried while shackled, the record shows that Harris was not tried while

in restraints. He fails to show any prejudice from any inadvertent view of him handcuffed before trial.

Harris claims appellate counsel was ineffective for failing to interview Harris's jurors from the first trial. He suggests appellate counsel would have discovered that some jurors saw Harris in handcuffs. Harris completely fails to show how he was prejudiced by this omission; nor does he show that, as a matter of prevailing professional norms, appellate counsel must interview every trial juror.

Harris, 167 P.3d at 442-43 (footnote omitted).

Petitioner's reliance on Deck v. Missouri, 544 U.S. 622 (2005), is misplaced.[6] Deck held that the use of visible shackles during the guilt and penalty phase of trial was forbidden unless it was "'justified by an essential state interest' – such as the interest in courtroom security – specific to the defendant on trial." Id. at 629. The juror's affidavit provided by Petitioner states Petitioner was seen coming off of the elevator in handcuffs and that the handcuffs were never seen being used during trial. (Petitioner's Exhibit 9) Secondly, securing a criminal defendant while being transported to the courtroom serves a reasonable state security interest.

Petitioner has not demonstrated that a juror's brief glimpse of a defendant in handcuffs outside of the courtroom is fundamentally prejudicial. Nor has Petitioner demonstrated the OCCA's determination of the absence of both deficient performance and of prejudice was unreasonable.

4. Failure to instruct that State must prove absence of heat of passion.

Petitioner next claims appellate counsel was ineffective for failing to assert on direct appeal that a defense to first-degree murder is an affirmative defense of heat

---

[6] The Supreme Court decided Deck in 2005 — after Petitioner's trial and direct appeal – and cannot, therefore, be considered in support of prevailing professional norms of appellate counsel.

of passion, and that the jury should have been instructed that the State had the burden of proving the absence of heat of passion beyond a reasonable doubt.

Petitioner raised his ineffective assistance of appellate counsel claim on post-conviction:

> Harris next claims that appellate counsel was ineffective for failing to raise as error several rulings of the trial court. He first claims the trial court should have instructed jurors that the affirmative defense of heat of passion is a defense to murder in the first degree. This jury instruction was not adopted until 2006, several years after Harris's trial. Beyond claiming that he "is not guilty of malice murder", [Application at 35] Harris fails to show any prejudice from the lack of this instruction.

Harris, 167 P.3d at 443.

In Mullaney v. Wilbur, 421 U.S. 684 (1975), the Supreme Court, construing a Maine murder statute allowing any intentional or criminally reckless killing to be punished as murder unless the defendant proves that it was committed in the heat of passion on sudden provocation, in which case it is punished as manslaughter, stated that "the Due Process Clause requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation when the issue is properly presented in a homicide case." Id. at 704.

> Two years after issuing the decision in Mullaney, however, the Supreme Court clarified that its holding should be narrowly construed. In Patterson v. New York, 432 U.S. 197, 214, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977), the defendant argued that Mullaney prohibited a state from permitting guilt or punishment "to depend on the presence or absence of an identified fact without assuming the burden of proving the presence or absence of that fact, as the case may be, beyond a reasonable doubt." The Court rejected that interpretation. Although it acknowledged that Mullaney requires a state to prove "every ingredient of an offense beyond a reasonable doubt" and prohibits a state from "shift[ing] the burden of proof to the defendant by presuming that ingredient upon proof of the other elements of the offense," the

Court declared it "unnecessary" to have gone further in <u>Mullaney</u>. <u>Id.</u> at 215, 97 S.Ct. 2319. <u>Patterson</u> thereby limited <u>Mullaney</u> to situations where a fact is presumed or implied against a defendant. <u>See id.</u> at 216, 97 S.Ct. 2319; <u>United States v. Molina-Uribe</u>, 853 F.2d 1193, 1203-04 (5th Cir. 1988), <u>overruled in part on other grounds by</u> <u>United States v. Bachynsky</u>, 934 F.2d 1349 (5th Cir. 1991) (en banc). Because the written instructions did not permit the jury to presume malice aforethought, required the State to prove malice aforethought beyond a reasonable doubt, and defined malice and heat of passion as mutually exclusive, the instructions provided to the jury in Mr. Bland's case did not violate <u>Patterson</u>. <u>See</u> <u>Davis v. Maynard</u>, 869 F.2d 1401, 1406-07 (10th Cir. 1989) (rejecting a <u>Mullaney</u> challenge to substantially similar jury instructions), vacated sub nom., <u>Saffle v. Parks</u>, 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990), opinion reinstated in part, 911 F.2d 415 (10th Cir. 1990) (per curiam).

<u>Bland v. Sirmons</u>, 459 F.3d 999, 1013 (10th Cir. 2006).

Petitioner relies on <u>U.S. v. Lofton</u>, 776 F.2d 918 (10th Cir. 1985), to support his claim that in state court, as in federal criminal trials, a defendant is entitled to an instruction on heat of passion as a defense. This claim was also raised in <u>Bland</u>, <u>supra</u>, and rejected by the Tenth Circuit, stating:

If this Court's decision in <u>Lofton</u> were controlling, Mr. Bland might well be entitled to relief. Under the AEDPA standard of review, however, a habeas petition shall not be granted unless the state-court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1) (emphasis added). The decisions of lower federal courts applying Supreme Court precedent are not determinative, <u>see</u> <u>Williams</u>, 529 U.S. at 406, 120 S.Ct. 1495, and in this case the lower federal courts have in fact divided as to the proper scope of <u>Mullaney</u> after <u>Patterson</u>. <u>Compare</u> <u>Lofton</u>, 776 F.2d at 920-21, <u>with</u> <u>Molina-Uribe</u>, 853 F.2d at 1203-04. Because the OCCA's decision reasonably applies the correct legal rule from <u>Mullaney</u>, as the Supreme Court construed that rule in <u>Patterson</u>, the OCCA decision is neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent, notwithstanding the interpretation of that rule in this Circuit.

<u>Bland</u>, 459 F.3d at 1014.

Petitioner had failed to demonstrate the OCCA's determination to be contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court. Petitioner's fifth ground for relief is denied in its entirety.

<u>Ground 6</u>: <u>Cumulative Error</u>.

Petitioner next claims that more than one constitutional error occurred in the first stage of his trial and this Court should consider those errors cumulatively and grant habeas relief.

It is true as a general principle of law that "[t]he cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error." <u>United States v. Oberle</u>, 136 F.3d 1414, 1423 (10th Cir. 1998)(<u>quoting</u> <u>United States v. Rivera</u>, 900 F.2d 1462, 1469 (10th Cir. 1990)). However, "'[a] cumulative-error analysis merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless.' The analysis, however, 'should evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors.'" <u>Id.</u> (<u>quoting</u> <u>Rivera</u>, 900 F.2d at 1470-71). <u>See also</u> <u>Newsted v. Gibson</u>, 158 F.3d 1085, 1097 (10th Cir. 1998); <u>Castro v. Ward</u>, 138 F.3d 810, 832-33 (10th Cir. 1998); <u>United States v. Trujillo</u>, 136 F.3d 1388, 1398 (10th Cir. 1998).

"In death penalty cases, we review whether the errors so infected the trial with unfairness as to make the resulting conviction a denial of due process, or rendered the sentencing fundamentally unfair in light of the heightened degree of reliability demanded in a capital case." <u>Wilson v. Sirmons</u>, 536 F.3d 1064, 1122 (10th Cir. 2008).

Upon review of the entire trial transcript and the evidence and testimony presented, the Court does not find the cumulation of those errors determined to be harmless had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993). Because this Court has concluded that no error occurred during the first stage of trial, the only matters considered here are the errors found by the OCCA. The error regarding the trial court's instruction on the defense of mental retardation found by the OCCA does not constitute constitutional error, but rather an error of state law. Cumulative error analysis applies only to constitutional errors. Young v. Sirmons, 551 F.3d 942, 972 (10th Cir. 2008). The other errors regarding comments made by the prosecutors were of minor. See Alvarez v. Boyd, 225 F.3d 820, 825 (7th Cir. 2000)("courts must be careful not to magnify the significance of errors which had little importance"). The errors were not so egregious or numerous as to prejudice Petitioner to the same extent as a single reversible error. The cumulative effect of the errors, when compared with the evidence and testimony presented at trial, did not significantly strengthen the state's case or diminish Petitioner's case. No reasonable probability exists that the jury would have acquitted Petitioner absent the errors. Accordingly, Petitioner's sixth ground for relief is denied.

Ground 7:     Ineffective Assistance of Trial and Appellate Counsel in 2005 Penalty Re-Trial and First Direct Appeal.

Petitioner claims trial counsel was ineffective for failing to investigate and then to seek a pre-trial determination that Petitioner was mentally retarded and thus ineligible for the death penalty.[7]   As set forth in Ground 5, to prevail on a claim of

_____

[7]     The Court acknowledges that "[i]n 2006, the American Association on Mental Retardation [ ] changed its name to the American Association on Intellectual and Developmental Disabilities [ ]. 'Intellectual disability,' rather than 'mental retardation,' is now the preferred terminology. [Citation omitted.]   Also, previously enacted federal legislation known as Rosa's

ineffective assistance of counsel, Petitioner must overcome the strong presumption of reasonable professional assistance and demonstrate both deficient performance and resulting prejudice viewed in light of prevailing professional norms. See Strickland, 466 U.S. at 689. In the instant case, Petitioner must also demonstrate the determination of the OCCA to be contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court. 28 U.S.C. § 2254(d).

Petitioner raised this issue on appeal from his resentencing trial. After setting forth the requirements of Strickland and its progeny for evaluating an ineffectiveness claim, the OCCA determined that no prejudice resulted from counsel's failure to request a pre-trial determination of mental retardation:

> A capital defendant who wishes to claim mental retardation must raise that claim with the trial court before the trial begins. A threshold requirement for such a claim is one IQ test of 70 or below; such a test will not itself guarantee a finding of mental retardation but may begin the process by which the court determines whether a defendant is mentally retarded. Harris had two IQ test scores, obtained during the pretrial process, of 66 and 68. He complains that counsel did not use these scores to initiate this process and attempt to determine whether he was mentally retarded before trial began. Harris argues that, given his test scores, if counsel had asked for a hearing to determine mental retardation the trial court would have been required to hold that hearing. At that hearing Harris might or might not have been found mentally retarded, but if he were found to be retarded, he would avoid the death penalty. Thus, Harris claims, he had nothing to lose and everything to gain by raising the issue, and counsel was ineffective for failing to do so.

---

Law, Pub.L. No. 111–256, 124 Stat. 2643 (2010), mandates the use of the term 'intellectual disability' in place of 'mental retardation' in all federal enactments and regulations. Nonetheless, throughout this opinion, the Court will use the old terminology because the legal sources relevant to its analysis, including Oklahoma law, prior opinions, and the opinions of the Supreme Court, use the terms 'mental retardation' and 'mentally retarded.' " Howell v. Trammell, 728 F.3d 1202, 1206 n.1 (10th Cir. 2013), quoting Hooks v. Workman, 689 F.3d 1148, 1159 n. 1 (10th Cir. 2012).

Harris cannot show he was prejudiced by counsel's failure. To prevail on a pretrial claim of mental retardation, Harris would have to show (1) significantly subaverage intellectual functioning; (2) manifested before the age of 18; (3) accompanied by significant limitations in adaptive functioning in at least two of nine enumerated skill areas. All the evidence in the record, including the evidence from the first trial and competency hearing, indicates that Harris could not meet this test. Despite these two IQ scores, all Harris's other IQ scores were over 70. All Harris's experts, including the ones who testified at his first trial and competency hearing, considered these scores along with Harris's other characteristics and concluded he was not mentally retarded.[8] Harris's expert, Dr. Draper, testified at his trial that he was not mentally retarded. She and other experts stated in this and other proceedings that Harris was "slow" or of low intelligence, but all agreed that his employment history, aptitude as a transmission mechanic, and other characteristics were not those of a mentally retarded person.

Harris argues that this Court cannot dispose of this claim using the prejudice analysis above. He admits the test for ineffective assistance of counsel is whether there is a reasonable probability that, but for counsel's unprofessional errors, the results of the trial would have been different. Regarding this claim, the different result would have been a finding of mental retardation and ineligibility for the death penalty. Thus, the Court is required to review the record to see whether, had counsel requested a hearing, Harris would have prevailed on his claim of mental retardation. There is no support in the record for such a conclusion. However, Harris argues that only a jury, not this Court, may make a determination of a defendant's possible mentally retarded status under any circumstances. Harris has misunderstood this Court's jurisprudence on this issue. In a series of cases involving retroactive capital post-conviction procedures, this Court has declined to make an initial finding of fact regarding mental retardation, remanding for jury determination the question of whether a capital defendant, convicted and currently on Death Row, is mentally

---

[8] "One expert did testify at the competency hearing that, based on the two low scores, he believed he had to say Harris was mildly mentally retarded, but that was not his conclusion after examining Harris and he found the scores surprising." (n. 55 in original).

retarded. That is not the issue here. The issue is whether, on this record, Harris's counsel was ineffective for failing to ask for a pretrial determination of mental retardation. Nothing in this record shows that, had counsel made that request, evidence would have shown by a preponderance of the evidence that Harris was mentally retarded. There is a great deal of evidence in the record to show otherwise, including the opinion of several experts who testified that Harris was not mentally retarded. We cannot conclude there was a reasonable probability that, but for counsel's omission, the results of this resentencing proceeding would have been different.

Harris, 164 P.3d at 1115-16 (footnotes omitted - except n. 55 in original).[9]

This Court's review is not to determine whether the OCCA's determination was incorrect or wrong. Rather, it is to determine if it was unreasonable to find trial counsel was not ineffective. Petitioner argues trial counsel failed to conduct a reasonable investigation and failed to request a trial to present evidence establishing mental retardation. He claims trial counsel should have retained a psychologist to test and assess retardation, that the psychologist would have provided an intelligence quotient (IQ) test result similar to the one submitted on direct appeal – an IQ of 67-75 – and would have also explained standard errors of measurement and the "Flynn Effect" and their impact on IQ scores. He further argues that the second and third prong of the standard for determination of mental retardation, manifestation before the age of 18 and significant limitations in adaptive functioning, have been met through expert testimony presented in his 2001 trial.[10]

---

[9] "We found in Propositions I and II that counsel was not ineffective for failing to claim Harris was mentally retarded, or for failing to present the evidence of mental status and mental illness raised in his first trial and competency proceedings. Relying on the issues raised in Propositions I and II, Harris claims that counsel failed to independently investigate the case as previously developed in order to satisfactorily conclude that the extant evidence was viable and reliable. This appears to be speculation, as the record does not support this allegation." Id. at 1118.

[10] In Atkins v. Virginia, 536 U.S. 304 (2002), the Supreme Court declared the execution of mentally retarded individuals unconstitutional. Although the Court set out some guidelines for

The issue, however, is whether the OCCA was unreasonable in concluding counsel's performance did not result in prejudice. Review of the record shows Petitioner's first IQ test at age seven resulted in a score of 87. Although he subsequently was retested in 2000 and 2001 with scores below 70, testimony was presented questioning those test results as having been influenced by decades of drug and alcohol abuse along with the stress of incarceration and mental illness with accompanying hallucinations and delusions. One additional test administered at Eastern State Hospital in 2001 resulted in a test score of 75. This test was administered in a more therapeutic environment and at a time when Petitioner was not abusing alcohol and his psychoses were controlled.

Petitioner testified at his first trial. The record reflects that he was coherent, responsive, and demonstrated a strong vocabulary with a good memory for details. The OCCA found Petitioner's testimony showed his ability to process and understand information, communicate well, and to engage in logical reasoning. Howell v. State, 138 P.3d 549, 564 (Okla. Crim. App. 2006). Considerable evidence was also presented at his first trial contrary to allegations of significant limitations in adaptive functioning. Testimony from both lay and expert witness was presented regarding Petitioner's ability to be self-directed, of his ability to diagnose and re-build transmissions, his lengthy work history, and his ability to care for himself and for others.

---

such determination, it left to the states to decide what criteria to use to determine who is mentally retarded. In Murphy v. State, 54 P.3d 556 (Okla. Crim. App. 2002), the OCCA followed the Atkins' guidelines and held that person is mentally retarded if (1) he or she functions at a significantly sub-average intellectual level, (2) that such mental retardation manifested itself before the age of eighteen, and (3) the mental retardation is accompanied by significant limitations in adaptive functioning in at least two of nine enumerated skill areas. The OCCA further held that no person shall be eligible to be considered mentally retarded unless he or she has an IQ of seventy or below as reflected by at least one scientifically recognized and approved contemporary intelligent quotient test. Id. at 567-68.

Based on the record available to the state court, the OCCA's determination that Petitioner was not prejudiced – and thus counsel was not ineffective – by trial counsel's failure to request a pre-trial determination of mental retardation was neither contrary to or an unreasonable application of clearly established federal law, nor an unreasonable determination of facts in light of the evidence presented. Accordingly, Petitioner's seventh claim for relief is denied.

Ground 8:    Ineffective Assistance of Trial Counsel Regarding Mental Illness and Impairment Evidence in 2005 Penalty Retrial.

Petitioner next claims trial counsel was ineffective for failing to present mitigating evidence that he suffers from mental illness and for failing to present expert testimony to rebut the continuing threat aggravating circumstance. On appeal from Petitioner's re-sentencing trial, the OCCA held:

> In Proposition II Harris claims that trial counsel was ineffective for failing to present evidence of diminished mental capacity and probable mental illness. This evidence was available to counsel or easily discoverable, and much of it was presented at Harris's first trial. Trial counsel has a duty to investigate and present relevant mitigating evidence. However, where counsel makes an informed decision to pursue a particular strategy to the exclusion of other strategies, this informed strategic choice is "virtually unchallengeable". We have noted that among counsel's basic duties is "to make informed choices among an array of alternatives, in order to achieve the best possible outcome for the client." The United States Supreme Court has found counsel ineffective where the failure to thoroughly investigate and present mitigating evidence "resulted from inattention, not reasoned strategic judgment."
>
> At Harris's resentencing trial, defense counsel presented mitigating evidence through Harris's sister, brother, former co-worker and employer, son-in-law, and two daughters. His most extensive mitigating evidence was presented through Dr. Draper, an expert witness in developmental analysis. Dr. Draper testified extensively regarding the developmental processes that led Harris to commit these

crimes. She began by discussing his tumultuous and abusive childhood. She described his medical problems throughout childhood as well as his learning disabilities, low intelligence, and academic and social problems in school, including schoolyard fights. Dr. Draper described how, during Harris's teenage years, his father taught him to be a transmission mechanic but also taught him to use drugs and alcohol regularly. Dr. Draper discussed the very negative effect on Harris of his mother's lingering death from cancer, the death of his grandparents, and the family's separation. She testified regarding Harris's brief first marriage. Dr. Draper noted that Harris's first wife had alleged he was abusive and filed for a victim's protective order and divorce, but said Harris's first wife told her that Harris did not abuse her and she had said otherwise because she wanted to leave him. Dr. Draper told jurors of Harris's attempt at suicide when his first wife left him. She explained that for several years Harris and Pam had custody of his daughters, and described his love for his daughters as well as his inability to engage emotionally as a parent. She described his relationship with Pam, including a mutual pattern of verbal and emotional abuse. Dr. Draper showed jurors how Harris depended on Pam emotionally and professionally.

Throughout her testimony Dr. Draper emphasized that Harris's chaotic and troubled background resulted in extreme emotional instability. She discussed how his low intelligence and chronic substance abuse contributed to his inability to handle stress or resolve problems. She described Harris's reliance on Pam, and his feelings of despair and devastation when Pam left him. Dr. Draper also emphasized Harris's anger at his situation, and at the loss of his tools, and his inability to control or appropriately express his anger. She testified that this inability was caused by Harris's immaturity, emotional instability, poor judgment, and confusion. She noted his expressions of remorse for Merle Taylor's death, while agreeing that Harris still blamed Pam for leaving him and causing him to commit the crimes. She discussed psychological methods of predicting future violence, and testified that in a controlled environment, medicated, without access to controlled substances and without a romantic partner, she did not believe Harris would be dangerous. Dr. Draper testified that Harris had been diagnosed as mentally ill and was on psychotropic medications in jail. She stated that she did not further explore the area

of mental illness because those diagnoses had been made after the crimes occurred, and her focus was on explaining Harris's actions and symptoms of underlying difficulties which led to the crimes. However, her observations of Harris's behavior were consistent with the diagnoses.

After Dr. Draper testified, counsel attempted to have a representative from the jail testify regarding the medications Harris took for his mental conditions. Counsel failed to give notice of this testimony to the State. The trial court noted that mere evidence Harris was on medication would encourage jury speculation regarding Harris's mental condition. Harris argues that this attempt shows counsel realized he had erred in failing to present evidence of mental illness.

Harris complains that counsel failed to present extensive evidence regarding his mental state and diagnoses of mental illness. Most of this evidence was presented at Harris's first trial or his competency proceedings, and was readily available to counsel. A significant portion of this evidence was presented at the first stage of Harris's original trial, to argue his mental state could not support a finding of malice, rather than as evidence in mitigation. After the crimes, questions were raised regarding Harris's competency. At one point he was sent to Eastern State Hospital, received treatment and medication, and was declared competent. Doctors representing the court, the State, and the defense examined Harris throughout the pretrial proceedings. He received several diagnoses of mental illness: bipolar disorder with psychotic features, schizo-affective disorder, depressive with psychotic features. Experts agreed at the very least Harris was clinically depressed. They all also noted his low intelligence. One expert for the State, and the doctors at Eastern State Hospital, suspected Harris was either malingering or exaggerating his mental condition. One defense expert testified that, based on his contact with Harris shortly after the crimes, Harris was probably suffering from mental illness at the time of the crimes. Nobody believed that Harris's mental illness, even if present when the crimes were committed, rendered him legally insane; the experts agreed that Harris knew right from wrong and understood the consequences of his actions. Harris's experts described the connection his mental illness and chronic substance abuse

may have had with the crimes. They testified that as a consequence of his mental state, Harris was low functioning and emotionally unstable, unable to solve problems or take action towards goals, highly agitated and angry. At the first trial, Harris's expert on future dangerousness testified that he could not say Harris would not be a danger to society; he did say that, in a controlled environment and with medication, Harris would present less danger than otherwise.

After thoroughly considering the evidence which was presented at Harris's resentencing trial, and the evidence which was presented earlier and could have been presented, this Court concludes that counsel was not ineffective. Counsel was aware of the evidence of mental condition and status. Rather than rely on it to persuade jurors that Harris's mental state and after-diagnosed mental condition were mitigating circumstances, counsel chose a different path. He called Dr. Draper to testify regarding Harris's development over his life. This evidence was comprehensive. It included Harris's troubled and abusive childhood, his low IQ and trouble in school, his difficulty with marital relationships, his relationships with his family and daughters, his dependency on Pam, the mutually abusive nature of that relationship. Dr. Draper also discussed Harris's chronic substance abuse which began when he was a teenager with his father, his poor judgment, anger and inability to solve problems, and his extreme emotional instability. She also discussed the likelihood that, based on his past behavior and mental state, Harris would be a danger in the future. While Harris's specific diagnoses of mental illness were not presented to the jury, jurors were told he had been diagnosed as mentally ill. Those diagnoses were made after the crimes, and Dr. Draper did describe the highly emotional mental state Harris was in at the time of the crimes. Dr. Draper used all this evidence to explain why Harris could not accept his circumstances and resorted to murder.

Harris claims that the prejudice from this decision is evident. At the first trial, jurors heard much of this evidence. During deliberations, they asked a question about the type of prison in which Harris might serve a sentence of imprisonment. The trial court's answer to this question, which was inaccurate as a matter of law, resulted in the case's reversal and this resentencing trial. Harris contends this indicates that his first jury seriously considered imposing

a sentence of less than death, and claims that, had the evidence been presented again, his resentencing jury would have done the same. This Court cannot speculate as to why Harris's first jury asked their question, or what its sentencing intent might have been. Counsel chose to provide Harris's resentencing jury with a thorough picture of his life, intelligence, and emotional state, including his anger, grief and despair immediately preceding the crimes. Through Dr. Draper, jurors heard evidence which encompassed or incorporated some of the evidence presented at the first trial. We will not second-guess counsel's reasoned strategic judgment. Counsel's choice of mitigating evidence did not amount to ineffective assistance.

Harris, 164 P.3d at 1116-18 (footnotes omitted).

As set forth previously, Petitioner must demonstrate deficient performance and resulting prejudice to prevail on a claim of ineffective assistance of counsel, and demonstrate the determination of the state court was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court. Petitioner claims that evidence of his mental deficiencies presented in his 2001 trial and his competency trial, along with evidence of his mental retardation, should have been presented to his re-sentencing jury as mitigating evidence to explain his violent behavior the day of the murder. Petitioner admits trial counsel's use of Dr. Draper to introduce evidence of his developmental and life paths was a sound strategic decision. He claims, however, that trial counsel recognized that mental illness was a valuable mitigating tool but his plan to use Dr. Draper to the exclusion of other mental health experts was unreasonable.

Petitioner's claim is myopic and ignores the totality of the evidence and testimony presented in his first trial. Expert testimony was presented that none of the possible mental health issues developed until after the crimes. The evidence presented was conflicting and did not with any certainty provide a reason for any

possible mental illness to be a contributor to the crimes.[11]   As the OCCA identified, counsel presented mitigating evidence through Petitioner's sister, brother, former co-worker and employer, son-in-law, and two daughters.   Most extensively, he presented testimony and evidence through Dr. Draper – an expert in developmental analysis – that not only described and explained Petitioner's development process but also incorporated opinions of other experts that had previously testified in other proceedings.   By avoiding the conflicting diagnoses offered in his first trial of possible mental illness – discovered after the crimes – and preventing the introduction of Petitioner's violent tendencies, trial counsel's presentation of a more sympathetic explanation of his life history was reasonable, as was the OCCA's conclusion on this point.

As set forth previously regarding claims of ineffective assistance of counsel, counsel's performance must be not merely wrong, but constitutionally unreasonable. "The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard."   Harrington v. Richter, 562 U.S 86, 105 (2011). Here, Petitioner has failed to meet his burden of demonstrating the requirements of Strickland, and failed to demonstrate the determination of the OCCA was contrary to, or an unreasonable application of, clearly established Supreme Court law. Review of the underlying issue of the performance of trial counsel demonstrates a lack of merit in Petitioner's claim.   As such, appellate counsel's decision to not include the claim in the appeal, given the necessary deferential consideration, does not constitute deficient performance.

As to his claim of ineffective assistance of counsel for failure to present expert testimony to rebut the continuing threat aggravating circumstance, the OCCA held:

---

[11]   Additionally, by not claiming mental illness as a mitigating factor, the jury was not informed that two experts had previously considered Petitioner to be a psycopath.

Harris also claims that counsel failed to present evidence directly bearing on the continuing threat aggravating circumstance. In fact, Dr. Draper did discuss methods for predicting future dangerousness, and gave her opinion that Harris would not be a future danger to society. Harris argues that counsel should have presented an expert on risk assessment, who could have provided an accurate and scientifically sound analysis of the exact likelihood that Harris would be a future danger. The experts who testified at Harris's first trial, and Dr. Draper, all testified that he was in fact likely to pose a risk of future danger. Harris's experts testified that, under particular circumstances likely to be found in prison, that risk was significantly lessened, but they all agreed that Harris posed more risk to the general population than the average person. Given this evidence, we will not say counsel was unreasonable for choosing not to stress the issue of Harris's potential for danger to society by using risk assessment evidence.

This proposition is accompanied by an Application for Evidentiary Hearing. To support his claim that counsel did not conduct a thorough independent investigation, Harris provides an affidavit with a psychological evaluation conducted after the trial ended. As he notes in his brief, this evaluation is consistent with other psychological evaluations which were available to counsel. To support his claim that counsel failed to present evidence bearing on the continuing threat aggravating circumstance, Harris offers an affidavit containing a risk assessment profile. This profile reaches a similar conclusion to that of Dr. Draper and other experts-in a controlled, structured environment, medicated, without access to controlled substances, and without a romantic relationship such as that with Pam, Harris poses little threat to society. The application for evidentiary hearing and supplemental materials do not contain sufficient information to show this Court by clear and convincing evidence there is a strong possibility trial counsel was ineffective for failing to use or identify the evidence. Harris's Application for Evidentiary Hearing is denied.

Id. at 1118-19 (footnotes omitted).

As identified by the OCCA, the risk assessment provided by Petitioner in support of his Application for Evidentiary Hearing in state court contains an opinion

regarding future dangerousness consistent with evidence and expert opinion presented at trial. The consensus opinion was that although Petitioner did present a risk of future dangerousness, the threat is lessened in a controlled and structured environment, free from the influences of a relationship like that with his ex-wife and free of controlled substances and alcohol. Considering the strength of the State's case and the overwhelming evidence supporting the continuing threat aggravating circumstance – evidence of a history of fighting, destruction of family member's property, physical and mental abuse of his spouse, threats against other individuals, resisting arrest, and an altercation with detention officer while in jail – the OCCA's determination was not unreasonable. Petitioner has failed to demonstrate counsel was ineffective and failed to demonstrate the determination of his claims by the OCCA was contrary to, or an unreasonable application of, clearly established Supreme Court law. Accordingly, this claim and Petitioner's entire ground for relief is denied.

Ground 9: <u>Oklahoma's Uniform Jury Instruction on Mitigating Circumstances</u>.

In his ninth ground for relief, Petitioner claims the definition of mitigating circumstances contained in the Oklahoma Uniform Jury Instructions (OUJI) impermissibly limits consideration of mitigating evidence and fails to make consideration of mitigating evidence mandatory in violation of the Eighth and Fourteenth Amendments. He argues that the first sentence of the instruction on mitigating circumstances – "Mitigating circumstances are those which, in fairness, sympathy, and mercy, may extenuate or reduce the degree of moral culpability or blame" – is grammatically flawed in that it only applies to the extent the mitigating circumstances extenuate or reduce the defendant's moral culpability.

The OCCA determined the instruction did not unconstitutionally limit the jury's ability to consider mitigating evidence:

Harris argues that the plain language of the uniform instruction's first sentence itself limits the jury's consideration of mitigating evidence. That sentence reads: "Mitigating circumstances are those which, in fairness, sympathy, and mercy, may extenuate or reduce the degree of moral culpability or blame." Harris admits this Court has rejected this line of argument. However, he suggests that the language is ambiguous at best, and, combined with prosecutorial argument, foreclosed the jury's consideration of mitigating evidence. He failed to object to either the instruction or argument at trial. Reviewing for plain error, we find none. We do not find that the current uniform jury instruction prohibits jurors from considering mitigating evidence. One prosecutor did consistently argue in closing that jurors should not consider Harris's second stage evidence as mitigating, since it did not extenuate or reduce his guilt or moral culpability. This argument improperly told jurors not to consider Harris's mitigating evidence. However, in final closing a second prosecutor invited jurors to consider all Harris's mitigating evidence, weigh it against the aggravating circumstances, and find that the death penalty was appropriate. The jury was properly instructed on the definition of mitigating evidence, the evidence Harris presented, and its duties. For that reason, the initial prosecutorial argument was harmless.

This Court is troubled, however, by the consistent misuse of the language in this instruction in the State's closing arguments. This Court noted in <u>Frederick v. State</u> that the prosecutor could argue mitigating evidence did not reduce a defendant's moral culpability or blame. However, we did not intend to suggest that prosecutors could further argue that evidence of a defendant's history, characteristics or propensities should not be considered as mitigating simply because it does not go to his moral culpability or extenuate his guilt. This would be an egregious misstatement of the law on mitigating evidence. After careful consideration, this Court has determined that an amendment to the language of the instruction will clarify this point, and discourage improper argument. We emphasize that the language of the current instruction itself is not legally inaccurate, inadequate, or unconstitutional. Cases in which the current OUJI-CR (2d) 4-78 has been used and applied are not subject to reversal on this basis.

In conjunction with this case, the Court will refer this issue to the Oklahoma Uniform Jury Instruction Committee (Criminal) for promulgation of a modified jury instruction defining mitigating circumstances in capital cases. To delineate the various purposes of mitigating evidence, this Court suggests including both (a) that mitigating circumstances may extenuate or reduce the degree of moral conduct or blame, and separately, (b) that mitigating circumstances are those which in fairness, sympathy or mercy would lead jurors individually or collectively to decide against imposing the death penalty.

The uniform jury instruction given in this case did not unconstitutionally limit the jury's ability to consider mitigating evidence. The prosecutor's improper argument on this issue was cured by further argument and instruction. Harris's claim for relief is denied. However, this Court finds that the current uniform jury instruction defining mitigating circumstances, OUJI-CR (2d) 4-78, should be modified to clarify the constitutional scope of mitigating evidence and discourage improper argument.

Harris, 164 P.3d at 1113-1114 (footnotes omitted).

The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal. The question in such a collateral proceeding is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process", Cupp v. Naughten, 414 U.S., at 147, 94 S.Ct., at 400, 38 L.Ed.2d 368, not merely whether "the instruction is undesirable, erroneous, or even 'universally condemned, . . . .'"

Henderson v. Kibbe, 431 U.S. 145, 154 (1977)(citations omitted); see also Cummins v. Sirmons, 506 F3d 1211, 1240 (10th Cir. 2007).

In Boyde v. California, 494 U.S. 370 (1990), the Supreme Court considered a claim that the wording of an instruction prevented the jury from considering the evidence of the defendant's character and background as such evidence did not

extenuate the gravity of the crime. The Supreme Court reiterated that the jury must be able to consider all relevant mitigating evidence. It held that the proper test is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." Id. at 380. The Court found it unlikely that the instruction prevented the jury from considering the mitigating evidence:

> All of the defense evidence presented at the penalty phase—four days of testimony consuming over 400 pages of trial transcript—related to petitioner's background and character, and we think it unlikely that reasonable jurors would believe the court's instructions transformed all of this "favorable testimony into a virtual charade." California v. Brown, 479 U.S., at 542, 107 S.Ct., at 840. The jury was instructed that it "shall consider all of the evidence which has been received during any part of the trial of this case," App. 33 (emphasis added), and in our view reasonable jurors surely would not have felt constrained by the factor (k) instruction to ignore all of the evidence presented by petitioner during the sentencing phase. Presentation of mitigating evidence alone, of course, does not guarantee that a jury will feel entitled to consider that evidence. But the introduction without objection of volumes of mitigating evidence certainly is relevant to deciding how a jury would understand an instruction which is at worst ambiguous. This case is unlike those instances where we have found broad descriptions of the evidence to be considered insufficient to cure statutes or instructions which clearly directed the sentencer to disregard evidence. See, e.g., Hitchcock v. Dugger, 481 U.S. 393, 398–399, 107 S.Ct. 1821, 1824–1825, 95 L.Ed.2d 347 (1987) ("[I]t could not be clearer that the advisory jury was instructed not to consider, and the sentencing judge refused to consider, evidence of nonstatutory mitigating circumstances ...").

Id. at 383-84.

As in Boyde, the instruction complained of by Petitioner did not limit the jury's consideration of the evidence presented in support of the mitigating circumstances. The jurors were instructed they should consider any evidence they

found mitigating and that they were not required to impose a sentence of death, even if the aggravating circumstances outweighed the mitigating circumstances. In fact, the jurors were instructed that they could not impose a sentence of death unless they determined the aggravating circumstances outweighed the mitigating circumstances. The jury was given an instruction listing thirteen mitigating circumstances. In addition to trial counsel's opening statements and closing argument, Petitioner presented six witnesses in support of the mitigating circumstances. Petitioner has not demonstrated the jury was prevented from considering his mitigating evidence because of the instruction. Even if the instruction was improper, Petitioner has not shown that the error so infected the entire sentencing trial that it violated due process. Additionally, Petitioner has not demonstrated the OCCA's determination to be contrary to, or an unreasonable application of, clearly established Supreme Court law. Accordingly, Petitioner's ground for relief is denied.

Ground 10: <u>Prosecutor's Closing Argument Regarding Mitigating Evidence</u>.

Petitioner next claims that prosecutorial misconduct during closing argument prevented the jury from considering mitigation evidence when one of the prosecutors argued that the jury should not consider mitigating evidence because it didn't reduce Petitioner's culpability or responsibility.[12] During initial closing, the prosecutor argued several times that the mitigating circumstances listed by the Petitioner did not reduce his culpability or responsibility for the crimes. The OCCA determined the prosecutor's comments were improper, but that the comments were harmless in light of later comments made in final closing arguments inviting the jury to consider

---

[12] This claim is closely related to Petitioner's claim raised in Ground 9 regarding the language of the jury instruction regarding mitigating circumstances.

all the evidence and in light of the proper instructions submitted to the jury. <u>Harris</u>, 164 P.3d at 1113.[13]

The deferential standard of review under 28 U.S.C. § 2254(d) is required since the OCCA adjudicated Petitioner's prosecutorial misconduct claim on the merits. <u>See</u> <u>Walker v. Gibson</u>, 228 F.3d 1217, 1241 (10th Cir. 2000), <u>abrogated on other grounds by</u> <u>Neill v. Gibson</u>, 278 F.3d 1044, 1057 (10th Cir. 2001). Petitioner does not demonstrate that the prosecutor's misconduct denied him a specific constitutional right. The appropriate standard for a prosecutorial misconduct habeas claim, therefore, is "'the narrow one of due process, and not the broad exercise of supervisory power.'" <u>Darden v. Wainwright</u>, 477 U.S. 168, 181 (1986)(<u>quoting</u> <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 642 (1974)). Accordingly, "it is not enough that the prosecutor's remarks were undesirable or even universally condemned." <u>Darden</u>, 477 U.S. at 181 (citation omitted). A prosecutor's improper remarks require reversal of a conviction or sentence only if the remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." <u>Donnelly</u>, 416 U.S. at 643, 645 (1974). The fundamental fairness inquiry requires an examination of the entire proceedings and the strength of the evidence against the petitioner, both as to the guilt stage and the sentencing phase. <u>Id.</u> at 643. "Any cautionary steps – such as instructions to the jury – offered by the court to counteract improper remarks may also be considered. Counsel's failure to object to the comments, while not dispositive, is also relevant to a fundamental fairness assessment." <u>Le v. Mullin</u>, 311 F.3d 1002, 1013 (10th Cir. 2002) (citations omitted).

---

[13] The entire portion of the OCCA's opinion addressing this issue is set forth in Ground 9, supra.

Petitioner has not demonstrated that his due process rights were violated by any or all of the prosecutor's statements. See Thornburg v. Mullin, 422 F.3d 1113, 1124-25 (10th Cir. 2005) (holding that the OCCA had adjudicated the merits of a due process claim because the OCCA's analysis of plain error involved the same test used to determine whether there was a denial of due process).

> Unlike in Boyde the prosecutor here argued to jurors during his closing that they should not consider Payton's mitigation evidence, evidence which concerned postcrime as opposed to precrime conduct. Because Boyde sets forth a general framework for determining whether a challenged instruction precluded jurors from considering a defendant's mitigation evidence, however, the California Supreme Court was correct to structure its own analysis on the premises that controlled Boyde. The Boyde analysis applies here, and, even if it did not dictate a particular outcome in Payton's case, it refutes the conclusion of the Court of Appeals that the California Supreme Court was unreasonable.
>
> * * *
>
> Boyde, however, mandates that the whole context of the trial be considered. And considering the whole context of the trial, it was not unreasonable for the state court to have concluded that this line of prosecutorial argument did not put Payton's mitigating evidence beyond the jury's reach.
>
> The prosecutor's argument came after the defense presented eight witnesses, spanning two days of testimony without a single objection from the prosecution as to its relevance. As the California Supreme Court recognized, like in Boyde, for the jury to have believed it could not consider Payton's mitigating evidence, it would have had to believe that the penalty phase served virtually no purpose at all.

Brown v. Payton, 544 U.S. 133, 143-44 (2005).

Upon review of the entire proceedings, the Court determines that, considered alone or together, the prosecutor's remarks did not so infect the trial with unfairness as to make the resulting conviction a denial of due process. For the reasons set forth in the previous claim for relief, and for the rationale as articulated by the Supreme

Court in <u>Boyde</u> and <u>Payton</u>, the jury was not prevented from considering the evidence presented in support of Petitioner's mitigating circumstances. Petitioner has not demonstrated that the OCCA's determination was contrary to, or an unreasonable application of, clearly established federal law. Accordingly, this claim is denied.

<u>Ground 11</u>: <u>Victim Impact Witnesses</u>.

Petitioner claims that the decedent's son and wife both expressed their opinion that death was the appropriate sentence in violation of his Due Process rights to a fair and reliable re-sentencing trial and the clearly established Supreme Court precedent of <u>Booth v. Maryland</u>, 482 U.S. 496 (1987) and <u>Payne v. Tennessee</u>, 501 U.S. 808 (1991). Respondent responds recognizing previous court opinions binding this court's review, but asserts the recommendations of punishment were harmless in light of the evidence presented.

In Petitioner's resentencing trial, the decedent's son, Toby Taylor, and the decedent's wife, Carolyn Taylor, both expressed their opinions that death was the appropriate sentence. On appeal, the OCCA refused to reconsider its position that witnesses giving a short, straight-forward recommendation for the imposition of the death penalty was statutorily permitted.

> Merle Taylor's son and wife each gave victim impact evidence, and asked jurors to impose the death penalty. Harris argues in Proposition VII that this recommendation was unconstitutional and denied him his right to a fair trial. Harris admits that this Court has held that family members of the victim may recommend a sentence in a capital sentencing trial, but urges us to reconsider. We decline this invitation.

<u>Harris</u>, 164 P.3d at 1110 (by footnote basing its determination on <u>DeRosa v. State</u>, 2004 OK CR 19, 89 P.3d 1124, 1151-52; <u>Conover v. State</u>, 1997 OK CR 6, 933 P.2d 904, 920; <u>Ledbetter v. State</u>, 1997 OK CR 5, 933 P.2d 880, 890-91, and stating

"Harris does not claim that the victim impact evidence itself was improper, other than the recommendation of punishment.").

In <u>Hooper v. Mullins</u>, 314 F.3d 1162 (10th Cir. 2002), the Tenth Circuit considered an identical claim where the trial court permitted three members of the victim's family to testify they believed the defendant deserved to die. The OCCA, as it has here, concluded the trial court properly admitted the testimony. Despite that determination, the Tenth Circuit agreed with the petitioner that the OCCA's determination was contrary to clearly established Supreme Court precedent:

> The Supreme Court has held that "if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no per se bar." <u>Payne v. Tennessee</u>, 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). In so holding, the Court overruled its earlier decisions in <u>Booth v. Maryland</u>, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), and <u>South Carolina v. Gathers</u>, 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989). <u>See</u> <u>Payne</u>, 501 U.S. at 811, 817, 830, 111 S.Ct. 2597. Nonetheless, we have recognized that " <u>Payne</u> left one significant portion of <u>Booth</u> untouched. . . . [T]he portion of <u>Booth</u> prohibiting family members of a victim from stating 'characterizations and opinions about the crime, the defendant, and the appropriate sentence' during the penalty phase of a capital trial survived the holding in <u>Payne</u> and remains valid.' " <u>Hain</u>, 287 F.3d at 1238-39 (quoting <u>Payne</u>, 501 U.S. at 830 n. 2, 111 S.Ct. 2597). Therefore, the trial court erred by admitting this victim-impact testimony during Petitioner's capital sentencing proceeding. <u>See id.</u> at 1239. Nonetheless, this constitutional error was harmless because it did not have a "substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht</u>, 507 U.S. at 637, 113 S.Ct. 1710 (further quotation omitted); <u>see also</u> <u>Willingham</u>, 296 F.3d at 931 (applying <u>Brecht</u>'s harmless-error analysis to similar claim).

> <u>Payne</u> also provides that victim-impact evidence that is "so unduly prejudicial that it renders the trial fundamentally unfair" deprives a capital defendant of due process. 501 U.S. at 825, 111 S.Ct. 2597. Because the victim-impact evidence did not have that effect

here, however, the OCCA reasonably denied Petitioner relief on this due-process claim. <u>See</u> <u>Willingham</u>, 296 F.3d at 931; <u>United States v. Chanthadara</u>, 230 F.3d 1237, 1273-74 (10th Cir. 2000).

<u>Hooper v. Mullins</u>, 314 F.3d 1162, 1174 (10th Cir. 2002).

It was error, in respect to <u>Booth</u> and <u>Payne</u>, for the witnesses to give their opinion of an appropriate sentence. This error alone will not provide a basis for habeas relief unless it can be determined the error was not harmless. Before a harmless error analysis can be undertaken, it must first be determined what type of error occurred - "trial error" or "structural" error. Here, the error complained of by Petitioner is "trial error" and a harmless error analysis is proper:

> Trial error "occur[s] during the presentation of the case to the jury," and is amenable to harmless-error analysis because it "may . . . be quantitatively assessed in the context of other evidence presented in order to determine [the effect it had on the trial]". . . . At the other end of the spectrum of constitutional errors lie "structural defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards". . . . The existence of such defects - - deprivation of the right to counsel, for example - - requires automatic reversal of the conviction because they infect the entire trial process.

<u>Brecht v. Abrahamson</u>, 507 U.S. 619, 629-30 (1993)(citations and footnote omitted).[14]

Admission of the witnesses' sentence recommendation of death was error and this Court must, therefore, assess the prejudicial impact of the error under the

---

[14] The Court's decision that this error is "trial error," not requiring automatic reversal, is supported by the list of sixteen cases set forth as example by the Supreme Court in <u>Arizona v. Fulimante</u>, 499 U.S. 279, 306-308 (1991)(Rehnquist, J.) detailing a wide range of errors to which harmless error analysis has been applied. Cases in which constitutional rights were so basic as to preclude harmless error include: <u>Payne v. Arkansas</u>, 356 U.S. 560 (1958)(coerced confession); <u>Gideon v. Wainwright</u>, 372 U.S. 335 (1963)(right to counsel); and <u>Tumey v. Ohio</u>, 273 U.S. 510 (1927)(impartial judge).

"substantial and injurious effect" standard set forth in <u>Brecht</u>. <u>See</u> <u>Fry v. Pliler</u>, 551 U.S. 112, 121-22 (2007).

In <u>Brecht</u>, the Supreme Court held that an error is harmless unless it "'had substantial and injurious effect or influence in determining the jury's verdict.'" <u>Brecht</u>, 507 U.S. at 631(quoting <u>Kotteakos v. United States</u>, 328 U.S. 750, 776 (1946)). Although improper, it is doubtful the witnesses' concisely stated opinions had much inflammatory impact compared to the nature of the murder, the strength of the state's case, and the extensive evidence supporting the aggravating circumstances. Petitioner shot and killed a man who had placed himself between Petitioner and Ms. Harris and attempted to convince Petitioner he should not be at the transmission shop. Petitioner also shot Ms. Harris and shot at an innocent bystander. When he ran out of bullets and experienced difficulties reloading his gun, Petitioner used the weapon to beat Ms. Harris. These facts, together with evidence of Petitioner's long history of violence, strongly support the jury's finding of the two aggravating circumstances.

Here, the witnesses' opinions regarding sentencing did not have a substantial and injurious effect on the jury's determination to recommend death as the appropriate sentence. Accordingly, Petitioner's claim is denied.

<u>Ground 12:</u>  <u>Re-allegation of the Continuing Threat Aggravating Circumstance</u>.

At his re-sentencing trial, the State re-alleged the continuing threat to society aggravating circumstance. The jury in Petitioner's first trial did not choose continuing threat as one of the aggravating circumstances. Petitioner claims this re-allegation is a violation of his double jeopardy and due process rights.

In Proposition VIII Harris argues that the State improperly re-alleged the continuing threat aggravating circumstance. In Harris's original trial and again at resentencing, the State alleged that Harris would constitute a continuing threat to society. At Harris's first trial, jurors did not find this aggravating circumstance. Harris claims that this

> failure is equivalent to an acquittal, and that the State was barred from re-alleging that he would be a continuing threat in the resentencing proceedings. This Court recently considered and rejected this claim in <u>Hogan v. State</u> [, 139 P.3d 907, 929-30 (Okla. Crim. App. 2006)]. We will not reconsider it in this case.

<u>Harris</u>, 164 P.3d at 1110 (footnote omitted).

Petitioner first claims that the OCCA's determination is based solely on state law and its refusal to apply Supreme Court law is, therefore, contrary to clearly established federal law as determined by the Supreme Court. Petitioner's assertion is mistaken for two reasons. First, the OCCA relied on its previous decision in <u>Hogan v. State</u>, as case in which it did discuss and rely on federal law. Second, a state court need not even be aware of Supreme Court precedent so long as neither the reasoning nor the result contradicts it. <u>Early v. Packer</u>, 537 U.S. 3, 8 (2002).

Petitioner asserts that the first jury "acquitted" him of the great risk of death aggravating circumstance by not checking that box on the form in his first trial, and that when the state subsequently sought that aggravating circumstance in his re-sentencing trial it violated the Eighth Amendment Double Jeopardy clause and Petitioner's Due Process rights.

In <u>Poland v. Arizona</u>, 476 U.S. 147 (1986), the Supreme Court rejected a claim identical to the one Petitioner presents here:

> We reject the fundamental premise of petitioners' argument, namely, that a capital sentencer's failure to find a particular aggravating circumstance alleged by the prosecution always constitutes an "acquittal" of that circumstance for double jeopardy purposes. <u>Bullington</u> indicates that the proper inquiry is whether the sentencer or reviewing court has "decided that the prosecution has not proved its case" *that the death penalty is appropriate*. We are not prepared to extend <u>Bullington</u> further and view the capital sentencing hearing as a set of minitrials on the existence of each aggravating circumstance. Such an approach would push the analogy on which <u>Bullington</u> is based past the breaking point.

<u>Poland v. Arizona</u>, 476 U.S. at 155-56 (footnote omitted)(emphasis in original).

Petitioner acknowledges <u>Poland</u> is contrary to his claim, but argues nonetheless that the subsequent Supreme Court decisions in <u>Ring v. Arizona</u>, 536 U.S. 584 (2002), <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000), and especially <u>Sattazahn v. Pennsylvania</u>, 537 U.S. 101 (2003), entitle him to relief.[15] Petitioner relies on the following passage to argue that he was acquitted of "'murder plus two aggravating circumstances' and convicted of the lesser offense of 'murder plus one aggravating circumstance' because the jury found the state had not met their burden of proof beyond the reasonable doubt and 'double jeopardy protections attach to that 'acquittal' on the offense of murder plus [two] aggravating circumstance(s).'" (Pet. at 189):

> In the post-<u>Ring</u> world, the Double Jeopardy Clause can, and must, apply to some capital-sentencing proceedings consistent with the text of the Fifth Amendment. If a jury unanimously concludes that a State has failed to meet its burden of proving the existence of one or more aggravating circumstances, double-jeopardy protections attach to that "acquittal" on the offense of "murder plus aggravating circumstance(s)." Thus, Rumsey was correct to focus on whether a factfinder had made findings that constituted an "acquittal" of the aggravating circumstances; but the reason that issue was central is not that a capital-sentencing proceeding is "comparable to a trial," 467 U.S., at 209, 104 S.Ct. 2305 (<u>citing</u> <u>Bullington</u>, <u>supra</u>, at 438, 101 S.Ct. 1852), but rather that "murder plus one or more aggravating circumstances" is a separate offense from "murder" simpliciter.

<u>Sattazahn</u>, 537 U.S. at 111-12. The Supreme Court continued, however, in the next paragraph:

> For purposes of the Double Jeopardy Clause, then, "first-degree murder" under Pennsylvania law-the offense of which petitioner was

---

[15] Petitioner recognizes, however, that the procedural facts in <u>Sattazahn</u> are different than those involved here. (Pet. at 188)

convicted during the guilt phase of his proceedings-is properly understood to be a lesser included offense of "first-degree murder plus aggravating circumstance(s)." See Ring, supra, at 609, 122 S.Ct. 2428. Thus, if petitioner's first sentencing jury had unanimously concluded that Pennsylvania failed to prove **any** aggravating circumstances, that conclusion would operate as an "acquittal" of the greater offense-which would bar Pennsylvania from retrying petitioner on that greater offense (and thus, from seeking the death penalty) on retrial. Cf. Rumsey, supra, at 211, 104 S.Ct. 2305.

Id. (emphasis added).

Here, Petitioner was not acquitted of the death penalty. The jury in Petitioner's first case found one aggravating circumstance and sentenced him to death. Thus, the first jury found the prosecution had proven its case that the death penalty was appropriate. Petitioner has failed to demonstrate that the determination of the OCCA was contrary to, or an unreasonable application of, clearly established Federal law as determined by the Supreme Court. This ground for relief is denied.

Ground 13: Ineffective Assistance of Counsel in the 2005 Resentencing Trial and Appeal.

The authority for establishing and determining an ineffective assistance claim is set forth in detail in Ground 5, supra, and need not be repeated here except to reiterate that it is difficult to establish ineffective assistance of appellate counsel, because counsel should not raise every non-frivolous claim, but select among them to maximize the likelihood of success. Miller v. Mullin, 354 F.3d 1288, 1298 (10th Cir. 2004); see also Smith v. Robbins, 528 U.S. 259, 288 (2000)(only when ignored claims are clearly stronger than those raised will the presumption of effective performance be overcome).

1.  Appellate counsel effectiveness regarding <u>Atkins</u>' claim.

Petitioner claims appellate counsel was ineffective for failing to claim that Petitioner's Equal Protection and Due Process rights were violated when he was "arbitrarily" denied a jury determination regarding his mental retardation.

> Finally, Harris argues in Proposition I that resentencing appellate counsel was ineffective for failing to claim that his denial of a jury determination of mental retardation denied him equal protection and due process. Harris's appeal after resentencing contained a claim that resentencing counsel was ineffective for failing to seek a determination that he was mentally retarded. We found that this decision did not support a finding of ineffective assistance because, as nothing in the record suggested Harris is retarded and much suggests he is not, Harris failed to show he was prejudiced by counsel's omission. Harris argues on post-conviction that resentencing appellate counsel should have separately raised the constitutional claims. He argues that he is similarly situated to other defendants who have been granted jury determination of this issue. As in his direct resentencing appeal, Harris again misunderstands the Court's jurisprudence on this issue. He cites cases in which post-conviction defendants already on Death Row, with no other recourse, filed post-conviction claims of mental retardation. These defendants had already been sentenced to death and sought an after-the-fact determination that they were ineligible for that sentence. As this Court does not engage in initial fact-finding, those cases were remanded for jury determination. Harris, by contrast, had not yet received the death penalty or any other sentence. He had the opportunity to raise his claim of mental retardation in the trial court, according to the procedures in effect at that time. Harris is not similarly situated to the capital post-conviction defendants and was not entitled to the procedures used in those cases. Neither his equal protection nor due process rights were denied by the procedures appropriate to his case. Harris was not prejudiced by resentencing appellate counsel's failure to raise this constitutional claim.

<u>Harris</u>, 167 P.3d at 444-45 (footnotes omitted).

There is debate between the parties regarding whether this claim has been exhausted. This court need not make that determination as the claim can be denied

on the merits. This claim is closely related to Petitioner's claim in Ground 7. Here, however, Petitioner claims that when the Supreme Court decided Atkins, it created a "class" of people – criminal defendants charged with a capital crime who are mentally retarded and may not be subject to execution. Petitioner makes this claim based on Cleyburne v. Cleyburne Living Center, Inc., 473 U.S. 432 (1985), where the Supreme Court determined that the Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." Id. at 439.

The OCCA's determination that Petitioner was not similarly situated to other inmates allowed to return to state court to raise their Atkins' claims is not unreasonable. As the OCCA identified, those inmates had already been sentenced to death and sought an "after-the -fact" determination they were ineligible to receive a sentence of death because of their mental retardation. Petitioner's resentencing occurred after the Supreme Court's decision in Atkins, providing him the opportunity to raise his claim that the other death row inmates did not have. Petitioner also was not denied due process as he had the opportunity to present his claim in the trial court. The fact it was not presented is discussed in the disposition of Petitioner's Ground 7.

For the reasons set forth above, and those in Ground 7, supra, Petitioner has failed to demonstrate either deficient performance or prejudice by appellate counsel. Additionally, he has failed to demonstrate the decision of the OCCA was contrary to, or an unreasonable application of, clearly established Supreme Court law.

### 2. Failure to present additional mitigation evidence.

Petitioner claims that appellate counsel was ineffective for failing to raise on direct appeal that trial counsel was ineffective for failing to present mitigating evidence from Petitioner's daughters that would have humanized him and shown that his life was worth saving. Although his daughters did testify at the resentencing

trial, Petitioner complains that the testimony was presented in a leading fashion and without the substance and specifics with which his daughters testified in his first trial.

> Harris suggests resentencing trial counsel failed to conduct reasonable investigation when he did not allow Harris's daughters to testify as fully as they had in the first trial. This claim is contradictory on its face; resentencing trial counsel was familiar with the record of the first trial, and made a strategic choice not to use all the testimony used in mitigation the first time. This is not a failure to investigate.

Harris, 167 P.3d at 443, n. 19.

The OCCA's determination is not unreasonable. Petitioner's daughters testified at the resentencing trial that they loved their father, were never abused by him, that he was a good father to them and provided for them, that they would visit him in prison and stay in touch with him, and that they had provided information to Dr. Draper who correctly described their home life with their father. They also asked the jury to spare his life. Trial counsel presented the jury with a humanizing description of Petitioner's life and of his relationship with his daughters. Petitioner has not demonstrated that trial counsel was either deficient or that his performance was prejudicial.[16] As such, appellate counsel was not ineffective for failing to raise this issue.

    3.   Failure to raise additional instances of prosecutorial misconduct.

Petitioner next claims appellate counsel was ineffective for failing to raise additional claims – other than that raised on direct appeal – of prosecutorial misconduct. Petitioner claims the prosecutor made several statements in closing

---

[16] It is noteworthy that including the extra testimony of Petitioner's daughters in the first trial still resulted in the jury sentencing Petitioner to death.

argument improperly raising societal alarm, stated facts not in evidence, and improperly argued victim impact testimony.

> Harris also claims that resentencing appellate counsel failed to raise the issue of prosecutorial misconduct. Harris's resentencing appellate brief has no separate proposition claiming prosecutorial misconduct, but misconduct issues are raised in Propositions VI. Harris offers other examples of misconduct which he claims resentencing appellate counsel should have raised, emphasizing the prosecutor's use of the victim impact statements in argument. Harris has not claimed in this Application or on appeal that the victim impact evidence itself was improper, and the record does not suggest otherwise. He has failed to show with this example or other references that prosecutorial argument deprived him of a fair trial with reliable results, or that an objection to the argument would have resulted in a different outcome.

Harris, 167 P.3d at 443-44.

As set forth in Petitioner's tenth ground for relief, supra, a prosecutor's improper remarks require reversal of a conviction or sentence only if the remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly, 416 U.S. at 643, 645 (1974).

Petitioner first claims the prosecutor incited societal alarm and argued facts not in evidence when in his first closing argument he argued the similarities between Petitioner's actions and a terrorist, and stated it was fortunate Petitioner didn't have an automatic weapon. Petitioner does not identify any facts improperly argued other than that there was no evidence presented that he was a terrorist or that he had or wanted an automatic rifle. He only describes the prosecutor's closing argument at satirical and causing societal alarm. The prosecutor's argument was in response to defense counsel's question to the jury in his closing asking if they saw differences between Petitioner and a terrorist. See Thornburg v Mullin, 422 F.3d 1113,1131 (10th Cir. 2005)(argument invited or in response to defense counsel easily falls within the wide latitude of argument allowed to prosecutors). Evidence was

presented that Petitioner emptied his pistol and then attempted to reload it. In addition to shooting Mr. Taylor and Ms. Harris, he also shot at a third person that happened to be in the building. When he couldn't reload his pistol, he physically beat Ms. Harris. The prosecutor argued when considering the events that it was fortunate Petitioner didn't have an automatic weapon. A prosecutor may comment on and draw reasonable inferences from evidence presented at trial. Hooper v. Mullin, 314 F.3d 1162, 1172 (10th Cir. 2002).

Regarding the victim impact testimony, Petitioner claims the prosecutor's reading almost verbatim the victim impact statements served to inflame the passions of the jury and improperly invoke sympathy. Victim impact is evidence properly admitted in the trial and the prosecutor is permitted to discuss the evidence during closing argument. Petitioner has not demonstrated, other than summarily concluding that the comments were improper and inflamed the jury, the prosecutor's arguments so infected the trial with unfairness as to make the resulting conviction a denial of due process. He has also failed the demonstrate the OCCA's determination to be unreasonable.

    4.   Claim regarding handcuffs and restraints worn in courtroom.

Petitioner claims appellate counsel was ineffective for failing to interview jurors from his resentencing trial and failing to present a claim that he was observed wearing handcuffs and restraints in the presence of jurors in violation of his due process rights.

> Harris argues that resentencing appellate counsel should have raised the issue that resentencing jurors saw him in handcuffs as he was escorted into the courtroom before trial. He fails to demonstrate any prejudice, and this will not support a claim of ineffective assistance of resentencing appellate counsel.

Harris, 167 P.3d at 444 (footnote omitted).

This claim is virtually identical to Petitioner's previous claim raised in sub-part three of his fifth ground for relief.[17] The differences are minor. This claim involves his resentencing jury and his argument involves juror statements claiming they would arrive early to court and would see the deputy escorting Petitioner into the courtroom with handcuffs or restraints. This issue has been addressed in Petitioner's fifth ground for relief and will not be repeated here. The argument and authority set out previously is incorporated here. Petitioner has not demonstrated that appellate counsel was ineffective.

     5. Claim regarding continuing threat aggravating circumstance.

Finally, Petitioner claims appellate counsel was ineffective for failing to raise the issue that the jury's finding of the continuing threat aggravating circumstance was not unanimous as required by Oklahoma law. Petitioner relies on two affidavits to claim that the jury did not reach a unanimous verdict on the aggravating circumstance.

> Harris claims resentencing appellate counsel was ineffective for failing to raise the issue of the validity of the continuing threat finding. The record reflects that the jury found Harris was a continuing threat to society and that, when polled, each juror affirmed that finding and the sentence of death. Harris relies on juror affidavits to suggest that not all jurors were unanimous regarding the continuing threat aggravating circumstance. A juror may not testify to any matter or statement made during deliberations which influenced his mental processes or verdict, other than extraneous prejudicial information or outside influences. We cannot consider these juror affidavits, and this claim cannot support a finding of ineffective assistance of resentencing appellate counsel.

Harris, 167 P.3d at 444 (footnote omitted).

---

[17] Comparison between the two reveals a majority of the argument and authority presented is an exact reproduction.

Petitioner claims the OCCA's determination of each juror's affirmation of the verdict was an unreasonable determination in light of the record. The record reveals, however, that the trial court asked the foreperson if the verdict was unanimous as to both aggravating circumstances and as to the sentence of death. The trial court then asked each individual juror if that was their verdict. Petitioner has not demonstrated that the OCCA's factual determination that the jurors were polled regarding the aggravating circumstances was unreasonable.

Petitioner has also not demonstrated the OCCA's inability under state law to consider the affidavits to be unreasonable. Tit. 12 O.S. 2001, sec. 2606(B) precludes offering evidence regarding a juror's mental processes during deliberations. Petitioner asserts that the corresponding federal rule, Fed. R. Evid. 606(b), permits testimony about an error in entering the verdict onto the verdict form. Reliance on the federal evidence rule is misplaced, however, because that rule relates only to the determination of the admissibility of evidence in federal cases. Petitioner has provided no Supreme Court authority requiring the consideration of juror affidavits to impeach a verdict, nor has he demonstrated the OCCA's determination to be contrary to, or an unreasonable application of, clearly established law.

For the foregoing reasons, Petitioner's thirteenth ground for relief is denied in its entirety.

Ground 14: Cumulative Error.

Petitioner claims that the accumulation of errors in his resentencing trial violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments. Petitioner raised this issue in his 2005 direct appeal from his resentencing trial. The OCCA determined the accumulation of errors did not warrant relief:

> In Proposition XII Harris claims that the accumulation of errors in the preceding propositions requires relief. In Proposition III, we found the

trial court erred in failing to bring the jury into open court when a question was presented in deliberations, but that error was harmless. In Proposition VI we found that error in argument was cured by instructions. Even taken together, these errors do not require relief.

Harris, 164 P.3d at 1119 (footnote omitted).

Petitioner also requested cumulative review in his 2005 post-conviction proceedings:

Harris claims in Proposition III that the accumulation of error on appeal and in post-conviction require relief. No authority allows this Court to consider, on post-conviction, errors raised on direct appeal which were not also raised as error in the post-conviction claim. We have determined that trial, resentencing, and appellate counsel were not ineffective. There is no cumulative error to consider.

Harris, 167 P.3d at 445 (footnotes omitted).

Authority regarding cumulative review was set forth in consideration of Petitioner's sixth ground for relief and need not be repeated here. Upon review of the entire trial transcript and the evidence and testimony presented, the Court does not find the cumulation of those errors determined to be harmless had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993). In addition to the errors found by the OCCA, the only error found by this court was the victim impact statements making sentence recommendations. That error was determined to be harmless. The errors were not so egregious or numerous as to prejudice Petitioner to the same extent as a single reversible error. The cumulative effect of the errors, when compared with the evidence and testimony presented at trial, did not significantly strengthen the state's case or diminish Petitioner's case. No reasonable probability exists that the jury would have sentenced Petitioner differently absent the errors. Accordingly, Petitioner's fourteenth ground for relief is denied.

CONCLUSION

After a complete review of the transcripts, trial records, appellate record, record on post-conviction proceedings, briefs filed by Petitioner and Respondent, and the applicable law, the Court finds Petitioner's request for relief in his *Petition For Writ of Habeas Corpus* (Dkt. No. 32) should be denied. ACCORDINGLY, habeas relief is DENIED on all grounds. An appropriate judgment will be entered.

IT IS SO ORDERED this 19th day of April, 2017.


STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE


08-0375p017.docx